**Ernest L. ALSTON, Plaintiff,**

v.

**Terry HOWARD, Nurse at Green Haven Podiatry Clinic; Dr. Organ, Head Podiatry of Green Haven Correctional Facility, Defendants.**

No. 93 Civ. 0204 (JES).

United States District Court,
S.D. New York.

May 8, 1996.

Ernest L. Alston, Stormville, New York, pro se.

Dennis C. Vacco, Attorney General of the State of New York (Kay–Ann D. Porter, Assistant Attorney General, of counsel), New York City, for Defendants.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge.

Pursuant to 42 U.S.C. § 1983, plaintiff Ernest L. Alston, acting *pro se*, brings the above-captioned action against Nurse Terry Howard and Dr. Philip Organ, claiming that defendants violated his constitutional rights to equal protection and to be free from cruel and unusual punishment by refusing to prescribe "high performance" footwear to remedy his ankle injury.[1] Pursuant to Federal Rule of Civil Procedure 56, defendants move for summary judgment on the grounds that plaintiff has failed to state a constitutional claim and that defendants are protected by qualified immunity.

## BACKGROUND

At the Green Haven Correctional Facility in New York ("Green Haven"), each inmate is issued one pair of ankle-high sneakers and six inch leather boots. *See* Affidavit of Philip Organ Sworn to August 4, 1995 ("Organ Aff.") ¶ 8. The New York State Department of Correctional Services ("DOCS") directives and Green Haven policy govern all requests for state shop boots and sneakers and provide that inmates are entitled to a new pair of sneakers every nine months and a new pair of boots every year. *Id.;* Defendants' Notice of Motion ("Defs.' Not.Mot."), Ex. B. The inmate is responsible for pursuing any issues regarding state-issued footwear. Organ Aff. ¶ 8. An inmate who needs or desires special footwear accommodations or new footwear must make a request to the state shop, which determines whether to issue new footwear to the inmate. *Id.*

---

1. In the caption on their legal memorandum and factual affidavits, defendants refer to plaintiff Ernest Alston as "Terry L. Alston." Because defendants correctly refer to plaintiff as Ernest Alston throughout the remainder of their filings, the Court disregards this distinction.

In some instances, inmates are recommended for special boots and sneakers, which are generally referred to as "high performance" boots and sneakers and are highly prized by inmates. *Id.* ¶ 9. High performance footwear, also known as "high top" footwear, fit above the ankle. *See* Deposition of Ernest L. Alston ("Alston Dep."), attached as Ex. C to Defs.' Not.Mot., at 43. High performance footwear are of higher quality construction than standard issue footwear but are not specially made or designed and have little therapeutic value. *See* Organ Aff. ¶ 9. In contrast, orthopedic footwear is made from a cast of the patient's foot and is constructed at special laboratories. *Id.* In addition, orthopedic footwear is specially made for a patient whose foot problem generally cannot be treated by medical or surgical means. *Id.*

At Green Haven, all prescriptions and medical recommendations must be approved by the Facility Health Services Director. *Id.* ¶ 31. Under no circumstances may a nurse authorize prescriptions for medical footwear without the approval of a podiatrist and the Facility Health Services Director. *Id.* Similarly, a nurse cannot deny an inmate his approved medical prescription without the authorization of the attending physician and the Facility Health Services Director. *Id.* In addition, a general practice physician must conduct an examination and issue a referral before a podiatrist can conduct a consultation or examination. *Id.*

At all times relevant herein, plaintiff Ernest Alston was incarcerated at Green Haven. *See* Complaint ("Compl.") at 3. Defendant Dr. Philip Organ is a podiatrist and surgeon who serves as a podiatric surgery consultant at Green Haven. *See* Organ Aff. ¶¶ 2, 3, 7. Defendant Terry Howard is employed as a nurse at Green Haven. Compl. at 3.

According to his medical records, Alston has a history of chronic pain in his left ankle resulting from sports injuries in 1982 and 1990. Organ Aff. ¶ 10; Compl. at 4. X-rays taken at Green Haven in May of 1991 revealed that he suffered a medical condition known as post-traumatic osteoarthritis. *See* Organ Aff. ¶ 10; Alston's Ambulatory Health Records ("AHR"), attached as Ex. A to Defs.' Not.Mot. As treatment, DOCS physicians prescribed crutches and a unna boot, commonly referred to as a soft-cast. Organ Aff. ¶ 11. The unna boot consists of gauze impregnated with zinc oxide which over time desiccates and causes a firm cast-like dressing to form over the foot. *Id.* By immobilizing the ankle, the unna boot distributes pressure to the foot, allowing the ankle injury to heal. *Id.*

On July 19, 1991, Dr. Organ examined and evaluated plaintiff's left ankle for the first time upon the referral of Alston's attending physician. *Id.* ¶ 12. According to the AHR, Alston complained of disabling pain in the left foot and ankle, especially across the outer aspect of the ankle joint and along the lateral side of his left foot. *Id.* Dr. Organ was unable to conduct a physical examination because Alston's left foot was sensitive to palpation. *Id.* After reviewing x-rays, conducting a visual examination and a cursory physical examination of Alston's ankle, Dr. Organ found that Alston had sustained minor damage to his left lateral ankle. *Id.* The x-rays revealed a bone spur on the top surface of the left talar head and an overgrowth of the ankle joint. *Id.* However, Alston's bone density was within normal limits. *Id.*

Based upon this examination, Dr. Organ concluded that Alston was experiencing arthritic changes in his ankle and around the ankle joint. *Id.* ¶ 13. He diagnosed Alston's condition as chronic arthritis, capsulitis, and synovitis. *Id.* Thereafter, Dr. Organ requisitioned a bone scan to rule out bone fractures, which could not be detected by x-ray. *Id.* After the examination, Alston was fitted with a posterior splint which immobilized the foot and ankle, allowing the ankle to rest. *Id.*

Alston continued to complain of pain in the anterior lateral aspect of his left ankle and pain in moving his ankle joint. *Id.* ¶ 14. After further examination, Dr. Organ, after discussing the risks and benefits of surgery with Alston, performed arthroscopic surgery on Alston's left ankle on November 20, 1991 at Butterfield Memorial Hospital. *Id.* ¶ 15. During this surgery, Dr. Organ made a small incision into the joint wherein a tube, with an

attached television camera was placed in the joint. *Id.* ¶ 16. The camera allowed Dr. Organ to view the shape of the joint and indicated the presence of any pathology, such as loose bones and cartilage or abnormalities on the lining of the joint. *Id.* Although Dr. Organ was able to gain access to the medial gutter of the joint, he was unable to place the arthroscope beneath the anterior capsule because Alston's joint was extremely stiff and tight. *Id.*

While performing the surgery, Dr. Organ found minor irritation and inflamed tissues in Alston's foot and joint. *Id.* ¶ 17. Dr. Organ extracted samples of these tissues from Alston's foot and sent them to pathology. *Id.* The arthroscopic surgery revealed that Alston's left ankle showed no serious physical damage. *Id.* As a result of the procedure, Dr. Organ determined that the inflamed tissues around the joint contributed to Alston's pain in his left ankle joint. *Id.*

On the day after the surgery, Alston asked Nurse Howard and Dr. Organ for high performance boots and sneakers. Dr. Organ denied his request. Compl. at 3. Instead, Alston was returned to Green Haven with instructions to continue using crutches. Organ Aff. ¶ 18. In addition, Alston was prescribed Feldene daily for 10 days and Tylenol with codeine four times per day. *Id.* On November 26, 1991, approximately six days after surgery, Alston reported that he was capable of walking without any pain and expressed his desire to quickly return to work and to wear regular shoes. *Id.* ¶ 19. Alston's incisions appeared to be healing well, and his left ankle showed no swelling. *Id.*

On December 3, 1991, the sutures from the incision were removed from Alston's left ankle. *Id.* ¶ 20. At that time, Alston did not complain of any pain, walked without any difficulty, and was able to wear "above the ankle" boots. *Id.;* Alston Dep. at 55–56.

On December 13, 1991, Alston was referred to a physical therapist for his ankle. Organ Aff. ¶ 22. On December 26, 1991, Alston commenced physical therapy three times per week for four weeks. *Id.* The physical therapy included placing Alston's left ankle in the whirlpool for fifteen minutes followed by ultrasound treatment to the anterior aspect of the ankle, stretching and theraband exercises, hot packs and bicycling. *Id.* Alston was also given certain exercises to perform on his own to further improve his condition. *Id.*

On January 14, 1992, Dr. Organ examined and treated Alston after he complained of pain in the inferior aspect of the left heel. *Id.* ¶ 23. Dr. Organ referred Alston to prosthetics for arch supports, which consist of plates fitted into the shoes. *Id.* In addition, Dr. Organ administered injections of local anesthesia into Alston's left ankle to reduce the inflammation in his ankle joints and requested x-rays to locate any bone spurs. *Id.* The x-rays revealed no calcaneal abnormality but indicated degenerative changes in the ankle joint in the tibial-talar joint. *Id.*

On February 4, 1992, Alston was seen by Dr. Jeanty, the Facility Health Services Director, who noted that Alston had been scheduled for orthotics. *Id.* ¶ 24. Apparently, Dr. Organ had not scheduled any such appointment. *Id.* Alston claims that Dr. Jeanty believed that high performance shoes or boots were appropriate treatment for Alston's medical condition. Compl. at 3–4.

Approximately three to four months postoperatively, Alston resumed his work as an institutional painter, which required painting for about 20 to 25 minutes at a time. Alston Dep. at 58–59. Thereafter, Alston continued to complain of pain in his left ankle and heel. Organ Aff. ¶ 25. As a result, Alston was examined and treated by medical personnel, including Dr. Organ, who prescribed and administered weekly injections of local anesthesia. *Id.* In addition, Alston's physical therapist recommended that a cushion be placed in Alston's footwear. *Id.*

On April 7, 1992, during an examination and treatment for pain, Alston indicated to Dr. Organ for the first time that he wanted to wear special shoes. *Id.* ¶ 26. In response, Dr. Organ told Alston that special footwear would not relieve Alston's pain, was inappropriate medical treatment for Alston's condition, *id.,* and was not in the budget. Compl. at 4.

On May 1, 1992, a consultant recommended orthopedic boots for Alston, and on

June 11, 1992, the recommendation was approved. Organ Aff. ¶ 26. Dr. Organ did not interfere with Alston's prescription for orthopedic boots, nor was he responsible for ensuring that the prescription was filled by the state shop. *Id.* Apparently, Dr. Organ did not see Alston during this time or at all between April 7, 1992 and March 23, 1993, at which time Alston again complained of pain in his left ankle. *Id.* Upon examination, Dr. Organ found no swelling of the joint or inflamed tissue. *Id.*

By affidavit, Dr. Organ opines that Alston's medical condition of chronic arthritis, capsulitis, and synovitis did not necessitate the use of special or orthopedic footwear. *Id.* ¶ 28. Nor was it medically necessary or even appropriate for Alston to wear high performance boots or sneakers because they would have no impact on Alston's condition. *Id.* To the contrary, in Dr. Organ's opinion, high performance footwear, which extend above the ankle, would tend to promote stiffness of the ankle joint. *Id.* Similarly, Dr. Organ considers ten inch boots medically inappropriate because they would act as a brace thereby causing Alston's ankle to become inflexible. *Id.* ¶ 29. Dr. Organ further states that over his 25 years of practice, he has never prescribed high performance footwear for his private patients with the same medical condition as Alston. *Id.* ¶ 30. Rather, Dr. Organ contends that patients with ankle injuries such as Alston's should wear an ankle brace, unna boot, or an ace bandage wrap. *Id.* In addition, Dr. Organ indicates that the appropriate course of treatment for this type of injury includes surgery, injections, bed rest, and crutches. *Id.*

Alston filed the instant action claiming violation of his Eighth Amendment right to be free from cruel and unusual punishment.[2] Alston seeks declaratory and injunctive relief as well as damages in the amount of $75,000. Compl. at 5. Pursuant to Federal Rule of Civil Procedure 56(c), defendants move for summary judgment on the grounds that Al-

ston has failed to establish that defendants were deliberately indifferent to his serious medical need and that defendants are, in any event, entitled to qualified immunity. For the reasons set forth below, defendants' motion is granted.

## DISCUSSION

■■■ Summary judgment is appropriate where "there is no genuine issue as to any fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–52, 106 S.Ct. 2505, 2509–12, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, the moving party has the burden of demonstrating the absence of any genuine issue of material fact. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). On the other hand, a party opposing a motion for summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Rather, the party must enumerate "specific facts and circumstances supported by depositions, affidavits based on personal knowledge, and admissions," and cannot rely upon conclusory allegations or denials. *General Elec. v. New York State Dep't of Labor,* 936 F.2d 1448, 1452 (2d Cir.1991).

■■■ To succeed in asserting his Eighth Amendment claim, Alston must establish that defendants were deliberately indifferent to his serious medical needs. *See Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). Deliberate indifference must have both a subjective and an objective component. *See Farmer v. Brennan,* —— U.S. ——, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Wilson v. Seiter,* 501

---

**2.** In addition, in his response to defendants' previous motion to dismiss, Alston asserts for the first time that defendants discriminated against him by granting other similarly situated inmates high performance footwear while denying Alston's request. *See* Plaintiff's Reply to Motion to

Dismiss (unpaginated) at 1. The Court construes Alston's filings liberally, *see Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972), as asserting an equal protection claim.

U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

■ In this case, however, the unrefuted evidence affords no rational basis for an inference of deliberate indifference to Alston's medical needs. It is clear, and indeed undisputed that Alston was afforded consistent, attentive surgical and therapeutic medical care on about a weekly basis in a comprehensive attempt to remedy the source of Alston's ankle pain. Although the constitution does not contemplate that prisoners receive unfettered access to medical care, *see Hudson v. McMillian,* 503 U.S. 1, 6, 112 S.Ct. 995, 998–99, 117 L.Ed.2d 156 (1992), Alston's care—which included arthroscopic exploratory and corrective surgery, physical therapy, regular oral and injected dosages of analgesics, arch supports, crutches and bed rest—appears to have been of a quality well above what might otherwise be available in the private sector.[3] It follows that Alston's allegations, even given the most generous reading, fail to establish that defendants' conduct is " 'repugnant to the conscience of mankind' " or incompatible with the " 'evolving standards of decency that mark the progress of a maturing society.' " *Estelle,* 429 U.S. at 102, 106, 97 S.Ct. at 292 (citations omitted).[4]

■ Nor has Alston established any rational basis for a claim that his medical needs were sufficiently serious to meet the objective component necessary to establish a constitutional violation. *See Hudson,* 503 U.S.

at 9, 112 S.Ct. at 1000 ("Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amount to an Eighth Amendment violation only if those needs are 'serious' "). To be serious, a medical need must constitute "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *see also Seiter,* 501 U.S. at 298, 111 S.Ct. at 2324 ("only those deprivations denying 'the minimal civilized measures of life's 'necessities' are sufficiently grave to form the basis of an Eighth Amendment violation").

■ Here, Alston walked without pain after the arthroscopic surgery and returned to his work as an institutional painter three or four months thereafter. *See Cole v. Scully,* 1995 WL 231250 (S.D.N.Y. Apr. 18, 1995).[5] Nor does Alston's disagreement as to the appropriate course of treatment create a constitutional claim.[6] *See Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 828, 121 L.Ed.2d 698 (1992). This is especially true since there is expert medical evidence supporting an inference that high performance footwear was an inappropriate treatment for Alston's ankle problem, and indeed might have exacerbated that injury by causing the ankle to stiffen and become inflexible.

3. Alston alleges that he underwent two additional operations on his ankle and was prescribed a customized brace and other special footwear to treat his injury. *See* Filing in Opp'n to Defs.' Mot. for Summ.J. Received November 24, 1995 (unsworn). However, these statements are not only insufficient to create an inference of deliberate indifference to his medical needs, but also support defendants' contention that Alston received extensive medical treatment for his injury.

4. Alston states that Dr. Organ performed two operations on his ankle and that a second doctor performed a third surgery to "repair some of the damage that was done by [Dr.] Organ." Filing in Opp'n to Defs.Mot. for Summ.J. at 1. However, this is at best a malpractice claim that does not rise to the level of a constitutional violation. *See Estelle,* 429 U.S. at 105–06, 97 S.Ct. at 291–92.

5. In *Cole,* the plaintiff, who suffered from a bunion deformity, brought an Eighth Amendment claim after he was denied special footwear. *Id.* at *3. The court held that his bunion deformity did not constitute a serious medical condition, noting that requiring plaintiff "to wear the wrong kind of shoes for a time as a matter of law does not demonstrate that he suffered from a 'condition of urgency, one that may produce death, degeneration, or extreme pain.' " *Id.* at *4 (quoting *Hathaway,* 37 F.3d at 66).

6. In addition, Alston fails to state a claim against Nurse Howard, who had no authority to prescribe or deny him special footwear. As set forth above, prescriptions must be approved by the Facility Health Services director. Indeed, Alston concedes that only a *podiatrist* may prescribe special footwear. *See* Compl. at 4.

Furthermore, Alston's equal protection claim alleging that he was denied high performance footwear while other similarly situated inmates with similar problems were not, must likewise be denied. Where, as here, Alston opposes summary judgment without enumerating any "specific facts and circumstances supported by depositions, affidavits based on personal knowledge, and admissions" which could rationally support a factual finding that he was denied equal protection, his claim must be dismissed. *General Elec. v. New York State Dep't of Labor*, 936 F.2d 1448, 1452 (2d Cir.1991). In this case, Alston stated at his deposition only that he had observed other inmates with "lesser problems" receiving high performance shoes and boots from Dr. Organ and other podiatrists at the Green Haven podiatric clinic. *See* Alston Dep. at 88–91, attached to letter from counsel for defendants filed May 17, 1995.

However, he was unable when requested to furnish defendants with the names of these other inmates. Alston Dep. at 91. On the other hand, Dr. Organ submitted an affidavit indicating that he has never prescribed high performance footwear to private patients who have the same medical condition as Alston. Organ Aff. ¶ 30. It follows that Alston's allegations are entirely too conclusory and lacking in evidentiary support to sustain an equal protection claim. *See General Elec.*, 936 F.2d at 1452.

This is especially true since he has set forth no factual basis upon which a rational fact finder could conclude that any alleged unequal treatment was based upon a class-based discrimination. In the absence of such proof, the defendants need only demonstrate a rational basis to deny high performance footwear to Alston, a standard which has clearly been met in this case. *See Soberal–Perez v. Heckler*, 717 F.2d 36, 41 (2d Cir.1983) ("[w]here a suspect class or a fundamental right is not implicated, the challenged action need only be rationally related to a legitimate governmental purpose"), *cert. denied*, 466 U.S. 929, 104 S.Ct. 1713, 80 L.Ed.2d 186 (1984); *see also Rivera v. Senkowski*, 62 F.3d 80, 84 (2d Cir.1995) (denying equal protection claim against defendants who had no authority to remedy alleged violation).

In any event, defendants are entitled to qualified immunity for the claims asserted against them individually. The doctrine of qualified immunity bars claims against government officials in their individual capacity arising out of the performance of their discretionary functions. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Qualified immunity shields government employees from liability for conduct that is objectively reasonable and "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.; see also Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987) (citations omitted). Dr. Organ provided Alston with a comprehensive course of appropriate treatment, including surgery, physical therapy, injections, analgesics, bed rest and crutches. His refusal to provide Alston with "high performance" footwear, which was not specially made or even therapeutic, was as a matter of law objectively reasonable and not in contravention of any clearly established federal or constitutional right. Similarly, given that Nurse Howard had no authority to prescribe "high performance" footwear, her failure to do so is also protected by qualified immunity.

### CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment shall be and hereby is granted. The Clerk of Court shall enter judgment accordingly and close the above-captioned action.