Terrence STEVENS & Thomas
Lynch, Plaintiffs,

v.

Glenn S. GOORD, et al., Defendants.

No. 99 Civ. 11669(LMM).

United States District Court,
S.D. New York.

Jan. 22, 2008.

Terence Stevens, New York, NY, pro se.

Thomas Lynch, pro se.

Joan Marie Magoolaghan, Koob and Magoolaghan, New York, NY, for plaintiffs.

John E. Knudsen, Attorney General of The State of New York, New York, NY, for Glenn S. Goord, M.D. Lester N. Wright, Christopher Artuz, Dr. Carl Koenigsmann, Neil Dunkleman, Larry Zwillinger, Donald Stevens, Sandra Fila, Dorothy Donngarra, Supt. Green, Dr. Norman H. Selwin, defendants.

Timothy S Brennan, Burke, Warren, Mackay & Serritella, P.C., Chicago, IL, Marie Flynn Danek, Phelan, Burke & Scolamiero, LO.L.P., Albany, NY, for Correctional Physicians Services, Inc., defendant.

## MEMORANDUM AND ORDER

McKENNA, District Judge.

Plaintiff Terrence Stevens ("Plaintiff") brought this action based on events that occurred while he was incarcerated at Green Haven Correctional Facility ("Green Haven"). Plaintiff Stevens was originally joined in this action by Plaintiff Thomas Lynch, who has since settled his claims with Defendants and whose claims have thus been dismissed. The defendants in this action are: 1) various physicians and officials at Green Haven;[1] 2) Dr. John C.

---

**1.** These officials (with John C. Bendheim, collectively "Green Haven Defendants") include Glenn S. Goord, Commissioner of the

Bendheim, a staff physician at Green Haven who is independently represented; and 3) a company called Correctional Physicians Services, Inc. ("CPS"). CPS has contracted with DOCS to be the manager of both physician specialty consultation services at Green Haven and the delivery of off-site acute care hospital services for Green Haven inmates. (Green Haven Defendants' Local Rule 56.1 Statement ("Defs.' 56.1 Stmt.") ¶ 16.)

Plaintiff Stevens seeks to recover damages against all defendants under 42 U.S.C. § 1983 (2003) ("Section 1983") for violation of his constitutional rights, specifically Defendants' alleged deliberate indifference to his serious medical needs in violation of the Eighth Amendment's prohibition of cruel and unusual punishment. Stevens also seeks damages against CPS for breach of contract and negligence. The Green Haven Defendants and CPS move, in three separate motions, for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## I. BACKGROUND

### a. Factual Background

Plaintiff Terrence Stevens was an inmate at Green Haven from May 4, 1993 through February 26, 1996, and from December 2, 1996 through January 31, 2001, when he was released from custody.[2] (Defs.' Rule 56.1 Stmt. ¶ 21.) Stevens suffers from a form of muscular dystrophy called alternatively Kugelberg–Welander Syndrome ("KWS") and Spinal Muscular Atrophy ("SMA") III. (*Id.* at ¶¶ 18–20.) The instant allegations concern the period of time from December 2, 1996 through January 31, 2001, during which time Stevens was housed at Green Haven's Unit for the Physically Disabled ("UPD"). (*Id.* at ¶ 21.)

The UPD is a housing unit for inmates with substantial disabilities. (*Id.* at ¶ 24.) During the period in which Stevens was housed in the UPD, certain aspects of the facility were governed by the decree of *Milburn v. Coughlin*, 79Civ5077 (RCC), a settlement accord of a class action suit. (*Id.* at ¶ 25.) The *Milburn* decree put in place certain requirements for the operation of the UPD, including: the presence of a primary care physician from the facility medical staff for a minimum of 12 hours per week; one nurse on duty at all times and two nurses on duty during the 7am–3pm shift; physiatry services provided at the facility for at least eight hours per week for direct patient care; and an Interdisciplinary Committee intended to (1) assist in the administration of the UPD, (2) review admission and discharge decisions, and (3) develop and review programs, policies and procedures for the UPD. (*Id.* at ¶ 25; Plaintiff Terrence Stevens' Response to Defendants' Local Rule 56.1 Statement ("Pl's 56.1 Resp. Stmt.") ¶ 25.)

New York State Department of Correctional Services ("DOCS"); Lester N. Wright, Regional Health Service Administrator; Larry Zwillinger, Regional Health Service Administrator; Christopher Artuz, former Superintendent of Green Haven; Charles Greiner, Superintendent of Green Haven; Carl Koenigsmann, M.D., medical director at Green Haven; Norman Selwin, M.D., ("Dr.Selwin"), physician and former medical director at Green Haven; John C. Bendheim, M.D., ("Dr. Bendheim"), physician at Green Haven; Lester Silver, M.D. ("Dr.Silver"), physician at Green Haven; Neil Dunkelman, M.D., physiatrist at Green Haven; Donald Stevens ("Stevens"), nurse administrator at Green Haven; Sandra Fila, nurse at Green Haven; and Dorothy Dongarra, nurse at Green Haven.

2. Between February 26, 1996 and December 2, 1996, Stevens was incarcerated at the Walsh Medical Unit in Mohawk Correctional Facility. (Second Am. Compl. ¶ 19, Ex. A to Schulman Decl.)

Defendants contend that a private consulting physiatrist was assigned to provide medical services in the UPD for half a day once per week, though Plaintiffs assert that the consulting physiatrist worked on the UPD for only approximately three hours per month during the relevant period. (Defs.' 56.1 Stmt. ¶¶ 26, 31; Pl.'s 56.1 Resp. Stmt. ¶¶ 26, 31.) Physiatrists specialize in physical therapy; because they do not have prescription writing privileges at Green Haven, physiatrists must have prescriptions written or co-signed by a DOCS physician. (*Id.*)

During the time period at issue, Drs. Sreedharan, Poellepelle, Perri and Weinstein and Defendant Dr. Dunkelman were private consulting physiatrists in the UPD. (Defs.' 56.1 Stmt. ¶ 36.) Defendant Dr. Norman Selwin was the acting Facility Health Services Director at Green Haven from December 2, 1996, until March 1999, when he was replaced in this capacity by Defendant Dr. Carl Koenigsmann. (Plaintiff's Statement Pursuant to Local Rule 56.1 ("Pl.'s 56.1 Stmt.") ¶ 52.) Since 1992, Defendant Donald Stevens has been the Nurse Administrator at Green Haven. (*Id.* at ¶ 54.) The Facility Health Services Director is responsible for supervising all medical staff, and shares with the Nurse Administrator the responsibility of supervising nursing staff. (*Id.* at ¶ 55.) Defendant Larry Zwillinger was the Regional Health Services Administrator for the Hudson Valley Region, including Green Haven Correctional Facility, from 1991 until 2002. (*Id.* at ¶ 57.)

During this period, Dr. Muldover and Dr. Robert Sachs also served sequentially as administering physiatrists on the UPD interdisciplinary team. Defendants contend that Dr. Muldover, as the physiatrist heading the UPD interdisciplinary team for the majority of the relevant time period, was ultimately responsible for many of the decisions regarding Plaintiff Stevens'

treatment and care. (Defs.' 56.1 Stmt. ¶ 37.) However, Plaintiff's medical records and deposition testimony from Defendant Dr. Dunkelman, one of Plaintiff's treating physiatrists and the only treating physiatrist to testify in this matter, suggest that Dr. Muldover had little if any direct contact with Stevens. (Pl.'s 56.1 Resp. Stmt. ¶ 37.)

During his time in the UPD, Plaintiff was assigned an inmate assistant to help him with basic daily functions, such as dressing, bathing, transfers from bed to wheelchair, and pushing the wheelchair, though Plaintiff contends that he was sometimes without an assistant to push his wheelchair. (Defs.' 56.1 Stmt, ¶ 29; Pl.'s 56.1 Resp. Stmt. ¶ 29.)

Defendant Dr. John Bendheim was the DOCS staff physician assigned to the UPD from the beginning of 1996 through June of 1999, when Dr. Bendheim was replaced by Defendant Dr. Lester Silver. (Pl.'s 56.1 Stmt. ¶¶ 44, 49.) Dr. Bendheim is not board certified in any discipline, which, according to DOCS policy, makes him unqualified to work as a unit physician for the UPD. (Pl.'s 56.1 Stmt. ¶ 48.) Dr. Bendheim was replaced by Dr. Silver in part because over the course of his three-year tenure in the UPD, according to Dr. Koenigsmann, Dr. Bendheim's relationship with the patients in the UPD "had deteriorated to a degree that was no longer therapeutic." (Koenigsmann Testimony ("Koenigsmann") at 77, Ex. F to Reinert Decl.)

According to the testimony of Defendants Drs. Selwin and Koenigsmann, the two Green Haven Facility Health Services Directors from the time period at issue, non-specialist DOCS doctors relied on specialist physiatrists to assign treatments for a muscular dystrophy patient, and physical therapists followed the recommendations of the physiatrists. (Defs.' 56.1 Stmt. ¶ 34.) Dr. Bendheim describes the

atmosphere in the UPD as one of disrespect, in which inmates were referred to as "scumbags" by DOCS employees and were considered "less human." (Bendheim Testimony ("Bendheim") at 42–43, Ex. I to Reinert Decl.)

Defendant Nurse Sandra Fila was the head nurse in the UPD for the entire relevant time period, and she primarily worked the day shift. (Pl.'s 56.1 Stmt. ¶ 50.) Defendant Nurse Dorothy Dongarra began working at Green Having in January 1997 and worked there until 2001. Nurse Dongarra worked exclusively in the UPD on the day shift beginning in 1999 for about a year. (*Id.* at ¶ 52.)

While housed at the UPD, Plaintiff repeatedly requested to be seen by a physician who was knowledgeable about muscular dystrophy. (Bates 3616, 3820, Ex. C to Schulman Decl.) However, Defendants did not permit Stevens to be evaluated by a muscular dystrophy specialist prior to April 2000, when Plaintiff was seen by Dr. Holstein. (Stevens Testimony ("Stevens") at 70, 130, Ex. G to Reinert Decl.) Stevens also claims that while he was at Green Haven, Defendants denied him adequate physical and occupational therapy. (Plaintiff's Memorandum of August 18, 2007 at 2, 9, 15.) Stevens alleges that as a result of not receiving adequate treatment, he has suffered extreme pain and suffering, emotional distress, and permanent injury. (Second Am. Compl. ¶ 34, Ex. A to Schulman Decl.)

Between December 1997 and December 2000, Plaintiff filed numerous grievances complaining of inadequate medical care, including Defendants' refusal to allow him to see a Muscular Dystrophy specialist (Bates 3616, 3749, 3820, Ex. C to Schulman Decl.), nurses' failure to renew his prescriptions in a timely fashion (Bates 3722, Ex. C to Schulman Decl.), Defendants' failure to provide him with adequate physical therapy (Bates 3616, 3722, 3749, Ex. C to

Schulman Decl.), and Defendants' failure to adequately address his pulmonary distress (Bates 3616, 3820, 4103, Ex. C to Schulman Decl.; Stevens at 68, 73–75).

### 1. Plaintiff's Access to Physical Therapy

As early as 1993, a DOCS staff physician's medical evaluation of Plaintiff indicated that he was experiencing increasing muscular deterioration as a result of his illness, and suggested that he receive passive range of motion exercises twice daily. (Pl.'s 56.1 Stmt. ¶ 229; Bates 1197, Ex. F of Pl.'s Medical Records.) A physician's evaluation from December 10, 1996 observed that Plaintiff needed physical therapy to maintain his muscle strength and range of motion. (Pl.'s 56.1 Stmt ¶ 230; Bates 1443, Ex. I of Pl.'s Medical Records.) Between February 1998 and February 2000, Drs. Bendheim and Silver ordered that Plaintiff receive range of motion exercises to his lower extremities twice a week provided by nursing staff, and in November 1999 Dr. Silver indicated that he would recommend an increase in Plaintiff's visits to the physical therapy department from weekly to three times per week. (Pl.'s 56.1 Stmt. ¶¶ 187, 231.) During the period from February 1998 to February 2000, Plaintiff visited the physical therapy department once per week at most. (*Id.* at ¶ 188.)

According to treatment records and Plaintiff's testimony, on Plaintiff's visits to the physical therapy department, he was treated by a trained physical therapist on 24 occasions between December 1996 and January 2001; otherwise, he was treated by a nurse or unlicensed physical therapy assistant. (*Id.* at ¶¶ 172, 235.)

For the majority of Plaintiff's time in the UPD, the nurses in the UPD were assigned to provide Plaintiff with regular

range of motion exercises and maintained a record of treatments in the treatment and medication record. (*Id.* at ¶¶ 177, 179–82.) The records indicate that there were numerous instances lasting between a week and three weeks in the period from October 1997 to December 2000 in which Plaintiff received no physical therapy treatments, (Pl.'s 56.1 Stmt. ¶ 166.) Beginning in January 1999, the frequency of Plaintiff's physical therapy sessions declined rapidly; he received four treatments in January 1999, two treatments in February 1999, and only two treatments total between March and November 1999. (*Id.*) Plaintiff also asserts that on multiple occasions nurses falsified medical records to indicate that they had provided Plaintiff with treatment when in fact they had not. (*Id.*)

Plaintiff claims that nurses in the UPD, particularly Nurse Dongarra, consistently refused to perform the range of motion exercises that Plaintiff was prescribed. (*Id.* at ¶ 98.) For a period of time beginning in November 1999, Dr. Silver excused nurses from having to perform range of motion exercises on Plaintiff, instead having untrained inmate health assistants perform the exercises. (*Id.* at ¶ 213.) Drs. Koenigsmann, Bendheim, and Donald Stevens, as well as Nurse Dongarra, asserted in their testimony that it would have been "inappropriate" for inmate health assistants to provide range of motion exercises to Plaintiff. (*Id.* at ¶ 210.)

In December 1999 the physiatrist observed that Plaintiff needed more aggressive physical therapy to counteract his neck pain; in response to Plaintiff's complaints in January 2000 of leg and knee pain over the past eight to nine months, the physiatrist recommended range of motion exercises twice daily. (*Id.* at ¶¶ 232, 233.)

The UPD nurses did not receive training to perform the range of motion exercises

that Plaintiff required in his physical therapy until after February 24, 2000. (*Id.* at ¶ 167.) Dr. Holstein, the muscular dystrophy specialist who later examined Plaintiff, described the exercises that the nurses had been performing up to this point (characterized by Plaintiff as essentially lifting his legs up and down) as inadequate treatment for Plaintiff. (*Id.* at ¶ 167.) Dr. Holstein stated in his testimony that proper range of motion exercises for patients with muscular dystrophy will sometimes require stretching past the point of resistance, and he acknowledged that some kind of training, formal or informal, is required to perform range of motion exercises of the type that nurses were assigned to perform for Plaintiff (*Id.* at ¶¶ 214, 221.) Plaintiff complained repeatedly that the nurses' and physical therapy assistants' failure to provide him with proper exercise resulted in persistent pain in his limbs. (*Id.* at ¶ 224.)

In April of 2000, Dr. Stevens referred Plaintiff to Dr. Holstein, a muscular dystrophy specialist, to evaluate his complaints of breathing difficulties and to recommend treatment to retard progression of SMA III and maximize Plaintiff's level of functioning. (*Id.* at ¶¶ 22, 23.) After examining Plaintiff, Dr. Holstein recommended that Plaintiff receive range of motion exercises to all four limbs on a daily basis, distal muscle strengthening exercises, creatine, chest therapy, incentive spirometer, pulmonary function tests, and a follow-up evaluation in three months. (*Id.* at ¶ 24.) Dr. Holstein recommended an emphasis on range of motion exercises in Mr. Stevens' knees and shoulders because he identified contractures in those areas and believed range of motion exercises would reduce restriction in those areas. (*Id.* at ¶ 26.)

Dr. Holstein asserted that the course of therapy that he prescribed for Plaintiff in

April of 2000 would have been appropriate for Plaintiff throughout his time in prison. (*Id.* at ¶ 31.) Dr. Holstein also expressed the belief that Plaintiff's muscle strength had deteriorated while in DOCS custody, though he offered no opinion regarding whether Plaintiff's condition was aggravated by the treatment he received while in DOCS custody. (*Id.* at ¶ 33.) Plaintiff's expert, Dr. Lange, testified that Plaintiff's care while in DOCS custody was deficient in that (1) he did not receive aggressive physical therapy consisting of range of motion, stretching and strengthening by an experienced physical therapist; (2) he did not have access to a motorized wheelchair; (3) Green Haven defendants failed to quantify the effect or severity of Plaintiff's scoliosis in relation to his chest pain and breathing difficulties; and Green Haven defendants failed to provide Plaintiff with occupational therapy. (*Id.* at ¶ 37.)

Plaintiff asserts that during the time period at issue, between 1996 and 2001, he suffered recurrent pain in his knees and a loss of function in his right hand, a claim that is supported by his medical records. (*Id.* at ¶¶ 162, 249.)

### 2. Treatment of Plaintiff's Pulmonary Distress and Chest Pain

Medical records and Plaintiff's testimony indicate that Defendants were aware from at least as early as August 1997 that Plaintiff was suffering from scoliosis and related breathing difficulties and chest pain. (Pl.'s 56.1 Stmt. ¶ 161.) At times, Plaintiff experienced pain in his chest wall that he described as "frightening" and so painful that it felt like an electrical shock was going through him. (*Id.* at ¶ 250.) However, Plaintiff apparently received no comprehensive evaluation or treatment for his scoliosis or breathing difficulties and chest pain until he was seen by Dr. Holstein, a muscular dystrophy specialist, in April of 2000.

On August 2, 1999, Dr. Silver examined Plaintiff, who complained of chest wall pain and difficulty breathing, and observed by reviewing Plaintiff's chart that his chest wall pain was "longstanding". (*Id.* at ¶ 251.) Dr. Silver also opined that the pain was "essentially untreatable," a judgment that Dr. Silver was unable to account for in his deposition testimony. (*Id.*)

In April 2000, Dr. Holstein examined Plaintiff and prescribed an incentive spirometer, which Plaintiff says resulted in improvement in his chest pain and breathing difficulties. (*Id.* at ¶ 257.) Dr. Holstein expressed the opinion that severe scoliosis was the cause of Plaintiff's breathing difficulties, and he recommended chest therapy because he believed it would help alleviate the breathing difficulties. (*Id.* at ¶¶ 25, 27.) According to Dr. Holstein, it is common knowledge among muscular dystrophy specialists that breathing difficulties can result from scoliosis. (Holstein Testimony ("Holstein") at 78–79, 96–97, Ex. L to Reinert Decl.) Plaintiff's respiratory difficulties decreased as a result of the treatments prescribed by Dr. Holstein. (*Id.* at ¶ 35.)

### 3. Plaintiff's Access to Occupational Therapy

The UPD staff did not provide occupational therapy to patients on the unit; occupational therapy could only have been provided through the referral process used for obtaining specialist consultations, as had been done for other patients at Green Haven. (Pl.'s 56.1 Stmt. ¶¶ 236, 237, 240.) According to Dr. Lange's testimony, if Plaintiff had had access to occupational therapy, it is likely that the function and mobility of his right hand would be better than it is currently. (*Id.* at ¶ 244.)

### 4. CPS' Role at Green Haven

Correctional Physicians Services is an agency outside the DOCS system that con-

tracted with DOCS to "provide or arrange for the provision of all medically necessary specialty physician services" to inmates at Green Haven Correctional Facility. (Contract between DOCS and CPS ("Contract") at 2, Ex. K to Brennan Decl.; Pl.'s 56.1 Stmt. ¶ 104.) According to the Contract between DOCS and CPS, "medically necessary" services are "defined as medical services, in an amount and frequency sufficient, according to accepted standards of medical practice, which are required to prevent disease, diagnose, correct, cure, alleviate or prevent the worsening of conditions that endanger life, cause suffering or pain, result in illness or infirmity, threaten to cause or aggravate a handicap, or cause physical deformity or malfunction." (Contract at 7.) The purpose of the contract between DOCS and CPS was to provide as much medically necessary health care as possible to prisoners in the facilities governed by the contract. (Pl.'s 56.1 Stmt. ¶ 108.) CPS agreed to provide the above services itself or through "engagement of qualified independent health care providers." (Contract at 2.)

During the time in which CPS was the specialty care coordinator for Green Haven, physical therapy was classified as specialized care, and physical therapy referrals had to be approved by CPS. (Pl.'s 56.1 Stmt. ¶ 113.) During the time that CPS had contracted with DOCS to provide specialty care services at Green Haven, the physical therapist who worked at Green Haven was a CPS employee, although the physical therapy assistant throughout this time was a DOCS employee. (Id. at ¶ 114.) Under the terms of CPS's contract with DOCS, CPS was paid a set fee, and CPS paid for the cost of any specialist consultations that they approved. (Id. at ¶ 118.)

CPS was responsible for approving or denying patient referrals to specialists, and only CPS had the authority to override a denial. (Id. at ¶¶ 113, 123.) DOCS medical administrators observed that there was an undercurrent of concern at Green Haven regarding the possibility that some CPS denials of specialist care were inappropriate. (Id. at ¶¶ 119–122.)

### b. Procedural Background

Plaintiffs Terrence Stevens and Thomas Lynch filed the instant federal action on November 30, 1999.[3]

On November 11, 2002, the Green Haven Defendants moved to dismiss the action for failure to exhaust administrative remedies as required by the PLRA, and CPS subsequently joined the motion. The Court denied Defendants' motion on June 16, 2003. On March 9, 2007, pursuant to a settlement agreement, the Court dismissed with prejudice the claims of Plaintiff Thomas Lynch against DOCS and CPS and the cross-claims of CPS against all other defendants in the action.

In May of 2007, Defendants filed the instant motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on Plaintiff Terrence Stevens' Eighth Amendment claim against all Defendants and breach of contract and negligence claim against Defendant CPS.

## II. DISCUSSION

### a. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the

---

**3.** Plaintiffs filed an amended complaint on January 21, 2000 and a second amended complaint on May 24, 2002 pursuant to the Court's previous ruling in this case. *See Stevens v. Goord*, No. 99 Civ. 11669, 2002 WL 987293 (S.D.N.Y. May 10, 2002).

moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "A dispute is not 'genuine' unless 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Nabisco, Inc. v. Warner–Lambert Co.*, 220 F.3d 43, 45 (2d Cir.2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "A fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law.' " *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir.2004) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

In weighing a motion for summary judgment, ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion. *See Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir.1990). However, "the non-moving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing Fed.R.Civ.P. 56) (emphasis and internal quotations omitted). "[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir.1996) (citations omitted).

### b. Plaintiff's Eighth Amendment Claim

Plaintiff claims that Green Haven Defendants and CPS were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment's prohibition of cruel and unusual punishment. ■ The Supreme Court in *Estelle v. Gamble*, 429 U.S. 97, 101, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." To prove "deliberate indifference to serious medical needs," a plaintiff must prove two elements: (1) that the alleged deprivation is, objectively, "sufficiently serious"; and (2) that the official in question had a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

■ The Second Circuit has observed that the objective medical need requirement of an Eighth Amendment claim is necessarily contextual and fact specific, and therefore "the serious medical need inquiry must be tailored to the specific circumstances of each case." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir.2003) (internal citations omitted). There is no bright-line test to measure the seriousness of a prisoner's medical need or condition, but the Second Circuit has set forth factors to "guide the analysis." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir.2003). Those factors include: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment'; (2) whether the medical condition significantly affects daily activities; and (3) the existence of chronic and substantial pain." *Id.* (citing and quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir.1992)).

In analyzing the objective element of an Eighth Amendment claim in the context of a plaintiff's claim regarding delayed provision of HIV medication, the court in *Smith* emphasized that the objective medical need inquiry will differ depending on whether a plaintiff alleges a temporary delay or interruption in the provision of otherwise adequate medical treatment or a general failure to provide treatment for a medical condition. 316 F.3d at 185. Where the challenged failure is a tempo-

rary delay or interruption, the Court found that "it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious' to support an Eighth Amendment claim." *Id.* (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). However, where a prisoner alleges that prison officials have failed to provide general treatment for a medical condition, the *Smith* court observes, "[t]here is no need to distinguish between a prisoner's underlying 'serious medical condition' and the circumstances of his 'serious medical need.' " *Id.* at 185–86. The Court goes on to say that "when medical treatment is denied for a prolonged period of time, or when a degenerative medical condition is neglected over sufficient time, the alleged deprivation of care can no longer be characterized as 'delayed treatment' but may properly be viewed as a 'refusal' to provide medical treatment." *Id.* at 186 (citing *Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000)).

The Supreme Court in *Estelle* recognized the Eighth Amendment to apply both to cases of serious illnesses where deliberate indifference "may actually produce physical 'torture or a lingering death' " and to "less serious cases" where the deliberate indifference "may result in pain and suffering which no one suggests would serve any penological purpose." 429 U.S. at 103, 97 S.Ct. 285. The Second Circuit, along with other circuits, has interpreted this standard as signifying that a defendant's act of deliberate indifference may form the basis of an Eighth Amendment claim based on a plaintiff's pain and suffering, even when the severity of a plaintiff's condition is not necessarily worsened by the act. *See McKenna v. Wright,* 386 F.3d 432, 437 (2d Cir.2004) (holding that a protracted delay in starting hepatitis C treatment stated a claim); *see also* *Boretti v. Wiscomb,* 930 F.2d 1150, 1154–55 (6th Cir.1991) ("a prisoner who suffers pain needlessly when relief is readily available has a cause of action against those whose deliberate indifference is the cause of his suffering.").

■ In addition to the objective medical need requirement, a plaintiff alleging an Eighth Amendment violation based on deliberate indifference to a serious medical need must establish that the defendants' actions meet a subjective standard of deliberate indifference. "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety.' " *Chance,* 143 F.3d at 702 (quoting *Farmer,* 511 U.S. at 837, 114 S.Ct. 1970). The Second Circuit has analogized this state of mind to the standard of "recklessness" as used in criminal law. *See Phelps v. Kapnolas,* 308 F.3d 180, 186 (2d Cir. 2002) (*per curiam* ).

■ To meet the deliberate indifference standard, a defendant's actions must go beyond negligence, demonstrating a reckless disregard for the risk presented. *Farmer,* 511 U.S. at 835, 114 S.Ct. 1970. The *Farmer* Court explained that "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842–43, 114 S.Ct. 1970. A plaintiff must establish a "conscious disregard of a substantial risk of serious harm." *Cuoco v. Moritsugu,* 222 F.3d 99 (2d Cir. 2000).

■ Mere disagreement over choice of treatment, or even a claim that negligence or medical malpractice has occurred, does not create a constitutional claim. *Estelle,* 429 U.S. at 105–06, 97 S.Ct. 285;

*Chance,* 143 F.3d at 703; *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd* 970 F.2d 896 (2d Cir.), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 828, 121 L.Ed.2d 698 (1992). However, medical decisions that are "contrary to accepted medical standards" may exhibit deliberate indifference, because the doctor has "based his decision on something other than sound medical judgment." *Verley v. Goord,* 2004 WL 526740, at *11 (S.D.N.Y.2004). In this vein, district courts in this circuit have denied summary judgment where a reasonable jury could conclude that conduct "was a substantial departure from accepted professional judgment and that the evidence of risk was sufficiently obvious to infer the defendants' actual knowledge of a substantial risk to plaintiff." *Ruffin v. Deperio,* 97 F.Supp.2d 346, 354 (W.D.N.Y. 2000).

■ Second Circuit precedent holds that the doctrine of *respondeat superior* does not apply in a suit for money damages under Section 1983, and that some "'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991)) (other citations omitted). A court may find the requisite degree of personal involvement by a supervisor in one of five ways:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant ex-

hibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

\* \* \* \* \* \*

Here, Defendants do not dispute that Plaintiff's underlying condition, a type of muscular dystrophy, is a serious medical condition. Defendants instead argue that they are entitled to summary judgment because much of the behavior forming the basis of Plaintiff's claims—particularly the gaps in provision of physical therapy and the delay in treating Plaintiff's respiratory problems and chest pains—constitute mere delays in treatment equivalent to the *Smith* plaintiff's delayed receipt of HIV medication, and therefore do not satisfy the serious medical needs requirement in the absence of evidence that the delays caused serious pain or long-term harm to Plaintiff.

Plaintiff argues that the record establishes several distinct bases for Eighth Amendment liability on the part of defendants, including: (1) Plaintiff's lack of access to appropriate physical therapy during the relevant period; (2) Defendants' excessive delay in treating Plaintiff's chest pains and respiratory difficulties; and (3) Defendants' failure to provide Plaintiff with occupational therapy.

**1. Plaintiff's Access to Physical Therapy**

■ Plaintiff claims that his lack of access to physical therapy while in the UPD provides the basis of a constitutional claim due to the frequent failure of DOCS medical employees to provide Plaintiff with the physical therapy, particularly range of motion exercises, prescribed for him; Plaintiff's frequent receipt of physical therapy from untrained or unlicensed providers;

and the Green Haven Defendants' failure to meet medical norms for the provision of physical therapy as a treatment of muscular dystrophy. Plaintiff received physical therapy from both the physical therapy department and providers outside the department—primarily nurses and inmate assistants—in order to alleviate the severe and chronic pain that he complained of in his limbs and to slow the long-term degeneration caused by his muscular dystrophy.

 Several sources of evidence, including Dr. Bendheim's testimony regarding Dr. Muldover's advice and evaluations by DOCS physicians from 1993 and 1996, indicate that it was generally known among Plaintiff's treating physicians that daily or twice daily physical therapy treatment would be advisable for properly treating his muscular dystrophy. (Pl.'s 56.1 Stmt. ¶¶ 229–30, 232.) Testimony from DOCS medical personnel also indicates that the lack of muscular dystrophy expertise on the part of any of Plaintiff's treating physicians or supervising physiatrists or specialists should have led Defendants to acquiesce to Plaintiff's requests for referral to a muscular dystrophy specialist prior to April of 2000. (*See* Pl.'s 56.1 Stmt. ¶¶ 58–61.) However, the medical judgment regarding the frequency of physical therapy to be prescribed—at least provided such therapy is being prescribed—like the decision regarding referral to a muscular dystrophy specialist, falls into the category of disputes regarding choice of treatment, which do not provide the basis for a constitutional claim. *See Estelle, supra,* at 105–06, 97 S.Ct. 285.

In contrast, Defendants' chronic failure to provide Plaintiff with the level of physical therapy treatment that had been prescribed and repeatedly recognized as necessary by treating physicians does provide support for Plaintiff's claim of deliberate indifference to serious medical needs. For the majority of the time at issue, the UPD

nurses, including Defendant Nurses Fila and Dongarra, were charged with providing Plaintiff with the physical therapy and range of motion exercises that he received outside of the physical therapy department. Medical records indicate numerous gaps in the provision of these physical therapy services to Plaintiff. In addition to many one- to two-week lapses in physical therapy provision prior to 1999, the frequency of Plaintiff's physical therapy sessions declined significantly beginning in January 1999: he received four treatments in January 1999, two treatments in February 1999, and only two treatments total between March and November 1999. (Pl.'s 56.1 Stmt. ¶ 166.) These lapses were in clear contravention of the treating physicians' prescriptions for the period from February 1998 and February 2000, when Drs. Bendheim and Silver ordered that Plaintiff receive range of motion exercises to his lower extremities twice a week by nursing staff, in addition to weekly visits to the physical therapy department throughout this period. (*Id.* at ¶¶ 187, 231.)

Plaintiff's assertion that on multiple occasions nurses falsified medical records to indicate that they had provided Plaintiff with treatment when in fact they had not suggests that the pattern of failure to follow prescribed physical therapy regimens could be even more pronounced than the medical records suggest. (*Id.* at ¶ 199.)

Plaintiff argues that his claim is further supported by the fact that the nurses and inmate assistants who administered his physical therapy were untrained and, according to Dr. Holstein and Dr. Lange, performed the range of motion and other exercises in a manner providing little or no benefit to Plaintiff. (Pl.'s 56.1 Stmt. ¶¶ 66, 167, 220–22.) Plaintiff notes that though the provision of such exercises by an inmate assistant violated DOCS regulations (an assertion supported by Dr. Koenigs-

mann's testimony), it was recommended by Dr. Silver and by the UPD interdisciplinary committee. (Pl.'s 56.1 Stmt. ¶¶ 209–213.) Drs. Lange and Holstein's characterizations of these improperly performed exercises as providing little or no benefit to Plaintiff establish the existence of a genuine issue of material fact as to whether the physical therapy treatments that Plaintiff received, falling far below what was prescribed, in frequency as well as quality, were the equivalent of no treatment. Furthermore, the acknowledgment by Drs. Koenigsmann, Bendheim and Stevens, that the use of untrained inmate assistants to perform range of motion exercises on Plaintiff was "inappropriate" and contrary to UPD policy (*see* Pl.'s 56.1 Stmt. ¶¶ 209–213), provides a strong case that UPD personnel were knowingly providing Plaintiff with treatment that violated "accepted medical standards." *See Verley, supra,* at *11.

These failures to adhere to prescribed therapy regimens are particularly egregious in light of Plaintiff's chronic and severe pain, well documented in his medical charts and acknowledged in Defendants' testimony, as well as the seriousness of Plaintiff's underlying condition, which necessitates that Plaintiff rely on others to provide physical therapy to slow the muscular degeneration caused by his disease. Defendants attempt to minimize the objective seriousness of the disease by arguing that the degenerative nature of the condition makes the lapses in physical therapy relatively insignificant in the long term. However, this argument is defeated by (1) the significance of Plaintiff's pain alone as a mandate for treatment, as demonstrated in case law (*McKenna, supra,* at 437); (2) as discussed by Dr. Lange, the functional importance to Plaintiff of even a small change in the motor function of his hands and lower extremities (Pl.'s 56.1 Stmt. ¶ 12); and (3) courts' finding that even when no permanent injury results, a

failure to properly treat can establish grounds for deliberate indifference (*Boretti, supra,* at 1154–55).

Defendants also improperly assert that Plaintiff's claims are undermined by the fact that, since his release, he has been assisted by untrained family members in performing range of motion exercises. The relevant inquiry for purposes of Plaintiff's Eighth Amendment claim is whether the treatment Plaintiff received in the UPD departed from professional norms and Defendants' subjective standards sufficiently to constitute deliberate indifference to Plaintiff's serious medical needs. Plaintiff's post-release access to proper medical care is irrelevant to this evaluation.

The Court finds that Plaintiff has established the existence of a genuine issue of material fact regarding the Plaintiff's claim of deliberate indifference to his serious medical needs in Green Haven Defendants' repeated failure to provide prescribed physical therapy treatments to Plaintiff. The repeated nature of these failures— sometimes of long duration (see Factual Background, *supra* )—combined with the improper provision of therapy by untrained nurses and inmate assistants demonstrate the existence of a genuine issue of material fact sufficient to defeat Defendants' summary judgment motion as to Plaintiff's Eighth Amendment claim.

██ Plaintiff additionally claims that the physical therapy department failed to provide therapy consistent with the standard of care, particularly by having physical therapy assistants perform treatments. This does not provide a valid basis for the constitutional claim, however, since Plaintiff has failed to show that the standard of physical therapy provided by the department was significantly below professional standards or that employing physical therapy assistants to perform the exercises so disadvantaged Plaintiff as to rise to the

level of deliberate indifference to a serious medical need.

As noted above, the UPD day-shift nurses were generally responsible for providing Plaintiff with his prescribed range of motion exercises, and the frequent lapses in these treatments were primarily due to the nurses' refusal to perform the exercises. As Nurse Fila was the head nurse and Nurse Dongarra shared responsibility for day shift duties, neither defendant can raise a colorable claim for summary judgment with respect to the failure to provide Plaintiff with prescribed exercises. The deliberate indifference shown by the nurses can additionally be imputed to those supervisory personnel responsible for overseeing the nurses, including Defendants Dunkelman, Stevens and Koenigsmann, as well as the doctors with access to Plaintiff's medical records, such as Drs. Bendheim and Silver, as a jury may infer that those with access to the records were familiar with their contents and that the failure to correct these lapses constituted deliberate indifference. Deliberate indifference may also be imputed to supervisory personnel, with regard to the failure to train nurses to properly administer the physical therapy. Plaintiff additionally included allegations regarding mistreatment and missed physical therapy treatments in his official grievance reports, which were reviewed and responded to by Dr. Koenigsmann. (*See,* e.g. Bates 3613, 3617, 3717, 3747, and 3750, Ex. C to Schulman Decl.)

■ Plaintiff's constitutional claim against CPS lacks the requisite showing of deliberate indifference to a serious medical need. Plaintiff has not alleged instances in which CPS failed to approve prescribed physical therapy or cases of CPS-affiliated physical therapy professionals refusing to provide prescribed physical therapy treatments, as Plaintiff has alleged with respect to Nurses Fila and Dongarra. There is furthermore no indication that CPS was charged with any responsibility regarding the training of DOCS nurses or personnel outside the Green Haven physical therapy department in the provision of physical therapy services. The Court therefore finds no grounds for sustaining Plaintiff's Eighth Amendment claim against CPS with respect to the provision of physical therapy to Plaintiff.

### 2. Treatment for Plaintiff's Chest Pain and Respiratory Distress

■ Plaintiff further claims that Defendants' delay in treating his scoliosis-related respiratory distress and chest pain provides an additional basis for his Eighth Amendment claim. While disagreements regarding choice of treatment are generally not actionable under the Eighth Amendment, judgments that have no sound medical basis, contravene professional norms, and appear designed simply to justify an easier course of treatment (in this case, no treatment) may provide the basis of a claim. *See Verley,* 2004 WL 526740, at *11; *see also Chance,* 143 F.3d at 703 ("[i]n certain instances, a physician may be deliberately indifferent if he or she consciously chooses 'an easier and less efficacious' treatment plan.").

Dr. Silver provided no medical justification for his judgment on August 2, 1999 that Plaintiff's chest pain and respiratory problems were "essentially untreatable," either in Plaintiff's chart or in his deposition testimony. Dr. Holstein's subsequent evaluation of Plaintiff in April of 2000 and treatment of his respiratory ailments with an incentive spirometer demonstrates that Plaintiff's condition was readily treatable by a physician familiar with muscular dystrophy and scoliosis and their attendant complications. Dr. Silver's decision to declare Plaintiff's condition "untreatable" rather than refer Plaintiff to a specialist,

particularly given the pain and discomfort that Plaintiff continued to suffer for approximately eight additional months as a result, goes beyond mere "negligence" and serves as an additional basis for Plaintiff's constitutional claim.

Therefore, the Court finds that Defendants' failure to treat Plaintiff's chest pain and respiratory distress in the period between August 2, 1999 and April of 2000, particularly given the intensity of the pain Plaintiff describes and the seriousness of respiratory and chest ailments generally, presents an additional genuine issue of material fact precluding summary judgment on Plaintiff's Eighth Amendment claim.

### 3. Plaintiff's Access to Occupational Therapy

As a final basis for his Eighth Amendment claim, Plaintiff argues that Defendants' failure to provide him with any occupational therapy throughout his time in the UPD constituted deliberate indifference to his serious medical needs. However, the Court finds that Defendants' denial of occupational therapy to Plaintiff falls squarely in the realm of disagreements regarding treatment, which do not provide valid bases for Eighth Amendment claims, though they may serve as the basis for negligence or medical malpractice claims.

### 4. Individual Defendants' Liability

Several of the defendants named in this action are DOCS or Green Haven officials without direct responsibility for supervising the provision of medical care in the UPD.

Plaintiff provides little basis for a finding of liability on the part of Defendants Goord, Wright, Zwillinger, Artuz and Greiner, beyond their constructive notice of Plaintiff's grievances by way of his formal complaints. However, Plaintiff offers no evidence to suggest that these defendant prison administrators ever saw his grievance reports or participated in the decision to grant or deny particular grievances, or that these defendants' official duties included direct oversight of the types of medical judgments at issue here.

The Eighth Amendment liability of subordinate employees is not sufficient to establish liability on the part of administrators. "[A] prison administrator is permitted to rely upon and be guided by the opinions of medical personnel concerning the proper course of treatment administered to prisoners, and cannot be held to have been 'personally involved' if he does so." *Joyner v. Greiner*, 195 F.Supp.2d 500, 506 (S.D.N.Y.2002). The record fails to demonstrate that Defendants Goord, Wright, Zwillinger, Artuz or Greiner had any personal involvement in decisions regarding Plaintiff's medical care; summary judgment is therefore appropriate with respect to these defendants.

Likewise, CPS is entitled to summary judgment on Plaintiff's Eighth Amendment claim because Plaintiff has failed to establish CPS' authority or involvement in the failures to provide prescribed physical therapy services or the failure to treat Plaintiff's chest pain and respiratory distress, which the Court finds give rise to potential Eighth Amendment liability for some Green Haven Defendants.

### 5. Qualified Immunity

Defendants argue that even if the Court finds the existence of issues of material fact as to whether they acted with deliberate indifference to Plaintiff's serious medical needs, they should be shielded from liability under the doctrine of qualified immunity. Qualified immunity shields government employees performing discretionary functions from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights

of which [a] reasonable person would not have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

The Court finds Defendants' position unpersuasive with respect to the surviving bases for Plaintiffs' Eighth Amendment claim: that Plaintiff was deprived of proper physical therapy by nurses' failure to perform prescribed exercises and by doctors' and supervising personnel's failure to supervise the treatments or properly train the nurses; and Dr. Silver's failure to treat Plaintiff's respiratory distress and chest pain. Clear Second Circuit precedent under *Brock v. Wright* and *Harrison v. Barkley* dictates that significant gaps in treatment of a plaintiff with a serious, degenerative condition such as muscular dystrophy who suffers recurrent pain can suffice to state a constitutional claim, and that both treating personnel and their supervisors may be subject to liability. As medical personnel in the UPD, a facility designed to provide care to physically disabled inmates, all relevant parties were in a position to be aware of the clear potential for liability in a case such as Plaintiff's. Though the analysis in every comparable case is highly fact-specific and requires consideration both of the seriousness of the underlying condition and the egregiousness of the conduct, the facts in this case put Defendants sufficiently on notice regarding Eighth Amendment liability. With respect to Plaintiff's physical therapy requirements, virtually all Green Haven Defendants conceded in their deposition testimony that they were aware of the risks that failing to receive range of motion exercises presented to a plaintiff such as Terrence Stevens. (Pl.'s 56.1 Stmt. ¶¶ 75–94.)

Qualified immunity therefore does not apply to shield any of the relevant Defendants from liability.

\* \* \* \* \* \*

For the above-stated reasons, Defendants' motion for summary judgment is granted with respect to Defendants CPS, Goord, Wright, Zwillinger, Artuz and Grenier. The Court denies Defendants' motion for summary judgment as to Defendants Koenigsmann, Selwin, Bendheim, Silver, Dunkelman, Stevens, Fila and Dongarra.

### c. Plaintiff's State Law Claims against CPS for Breach of Contract and Negligence

Plaintiff additionally brings claims against CPS under state law for breach of contract and negligence.

### 1. Plaintiff's Breach of Contract Claim

Plaintiff argues that as an inmate of Green Haven relying on the medical services that CPS has contracted with DOCS to provide in part, Plaintiff is a third party beneficiary of the contract between CPS and DOCS and may claim damages for CPS's breach of this contract to provide prisoners with "reasonable access" to "specialty medical services." (Contract at 2.) Defendant CPS argues that summary judgment is appropriate on Plaintiff's breach of contract claim because (1) Plaintiff cannot establish that he is an intended third party beneficiary of the contract between DOCS and CPS and (2) Plaintiff has not established any breach of the contract.

Under New York State law, a party claiming rights as a third-party beneficiary must demonstrate "(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is

lost." *State of Cal. Pub. Employees' Ret. Sys. v. Shearman & Sterling*, 95 N.Y.2d 427, 434–35, 718 N.Y.S.2d 256, 741 N.E.2d 101 (App.Div.2000). In *Owens v. Haas*, the Second Circuit found that a federal prisoner was an intended beneficiary of a contract between the federal government and a county prison authority providing for the care of " 'persons held under authority of any United States statute,' " emphasizing the government's general duty of care towards prisoners in its custody. 601 F.2d 1242 (2d Cir.1979), *cert. denied*, 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979).

The plain language of the contract between DOCS and CPS indicates that the contract is intended to provide specialty medical services to prisoners. The clear implication of the contract language is that prisoners in DOCS facilities are intended beneficiaries of the contract, as the medical services at issue in the contract are for their benefit.

Plaintiff argues that CPS breached its contract with DOCS by failing to provide Plaintiff with a level of physical therapy services adequate for his needs. By its terms, the contract between CPS and DOCS obligates CPS to "provide or arrange for the provision of all medically necessary specialty physician services" to Green Haven prisoners itself or through "engagement of qualified independent health care providers." (Contract at 2.) CPS insists that its role in the provision of medical services was equivalent to that of an HMO, and that when a referral was submitted by a DOCS physician, CPS would arrange for specialty services or hospital visits through providers with whom CPS had contractual arrangements. (CPS Statement of Facts Pursuant to Rule 56.1 ("CPS's 56.1 Stmt.") ¶¶ 39–43.)

Plaintiff's expert, Dr. Lange, found that the physical therapy that Plaintiff received during the relevant period, including range of motion exercises from nurses and inmate assistants and treatment in the physical therapy department, was generally inadequate, noting that there was no indication that trained physical therapists were regular participants in Plaintiff's care. (Lange Report, Ex. E to Schulman declaration.) As the party responsible for reviewing specialist referrals and contracting with the physical therapist on location in the Green Haven physical therapy department, CPS could conceivably be found liable for improper denials of referrals submitted by DOCS physicians or for failure to ensure the provision of proper care by the physical therapy professional. However, Plaintiff does not allege that CPS improperly denied particular specialist referrals or that the physical therapy professional contracted by CPS failed to provide care that he or she was directed to provide. Plaintiff instead alleges general failings in the frequency and quality of physical therapy provided to him, and absent specific claims of poor care on the part of the physical therapy professional or other CPS-affiliated parties, Plaintiff cannot establish the existence of a genuine issue of material fact that would preclude summary judgment on his breach of contract claim. The responsibility for the general oversight of Plaintiff's care lies with the DOCS physicians charged with treating and monitoring his condition.

The Court therefore grants CPS's motion for summary judgment as to Plaintiff's breach of contract claim.

### 2. Plaintiff's Negligence Claim

Plaintiff also claims that CPS was negligent in its provision of physical therapy services. As with Plaintiff's breach of contract claim, summary judgment is appropriate on the negligence claim because Plaintiff fails to point to specific failures on the part of CPS-affiliated professionals— either in the referral process or in the

provision of physical therapy services—that constitute a basis for a negligence claim against CPS.

### III. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment on Plaintiff's Eighth Amendment claims is GRANTED with respect to Defendants CPS, Goord, Wright, Zwillinger, Artuz and Grenier and DENIED with respect to Defendants Koenigsmann, Selwin, Bendheim, Silver, Dunkelman, Stevens, Fila and Dongarra. Defendant CPS's motion for summary judgment on Plaintiff's claims for breach of contract and negligence is GRANTED.

The parties are to submit a proposed joint pretrial order not later than February 29, 2008, or such other date to which they may agree in writing.

SO ORDERED.