William HATHAWAY, Plaintiff–Appellee,

v.

Thomas A. COUGHLIN, Commissioner of the Department of Correctional Services, Everett W. Jones, Superintendent of Great Meadow Correctional Facility; Benjamin Dyette and James Sullivan, Defendants,

Joseph Foote, Defendant–Appellant.

No. 1530, Docket 93–2732.

United States Court of Appeals, Second Circuit.

Argued April 18, 1994.

Decided Sept. 29, 1994.

Michael S. Buskus, Asst. Atty. Gen., Albany, NY (G. Oliver Koppell, Atty. Gen., Peter H. Schiff, Deputy Sol. Gen., Peter G. Crary, Asst. Atty. Gen., of counsel), for defendant-appellant.

Edward Z. Menkin, Syracuse, NY, for plaintiff-appellee.

Before: ALTIMARI, McLAUGHLIN, and JACOBS, Circuit Judges.

ALTIMARI, Circuit Judge:

Defendant-appellant Joseph Foote ("Foote") appeals from an order of the United States District Court for the Northern District of New York (Scullin, *J.*), denying his motions for a directed verdict. Plaintiff-appellee William Hathaway ("Hathaway"), an inmate at a New York State correctional facility, instituted this action under 42 U.S.C. § 1983, alleging that Foote, who was a prison doctor, and other defendants exhibited deliberate indifference to his serious medical needs in violation of the Eighth Amendment. After the jury could not reach a verdict, the district court declared a mistrial and denied Foote's motions to dismiss. Because we conclude that a rational jury could find that Foote was deliberately indifferent to Hathaway's serious medical needs, we affirm the order of the district court.

## BACKGROUND

Hathaway was an inmate at the Great Meadow Correctional Facility ("Great Meadow") operated by New York State. In 1973, prior to his incarceration, Hathaway underwent hip fusion surgery for his arthritic left hip. During the surgery, three metal pins were inserted to stabilize his left hip joint. Hathaway continued to experience pain after this surgery and first sought medical attention at Great Meadow on June 17, 1977, when

he was evaluated by Dr. Schlesinger ("Schlesinger"). Schlesinger found that Hathaway's left leg was shorter than his right, and prescribed orthopedic shoes to effect a height equalization. Shortly thereafter, Foote, a general practitioner, consulted with Schlesinger regarding Hathaway's condition.

On November 22, 1977, Hathaway was referred to Dr. Quellman ("Quellman"), an orthopedic specialist, based on a radiology report revealing that Hathaway suffered from a degenerative disease in the left hip joint. Quellman confirmed that Hathaway's hip had not fused properly and noted in his report that three metal pins crossed the hip joint. Quellman also noted that he offered Hathaway the option of surgery to refuse the hip, which Hathaway declined on February 3, 1978. Although he declined surgery at that time, Hathaway continued to seek medical attention for recurrent pain in his hip six times over the next several months. In response to Hathaway's complaints, Foote prescribed new orthopedic shoes and recommended that Hathaway be housed on a first-floor cell and exempted from heavy lifting.

Hathaway's medical record does not reveal any complaints of pain in 1979. Beginning in May 1980, however, Hathaway complained about his hip pain to Foote with increasing regularity. Shortly after he began to suffer hip pain, x-rays taken on July 10, 1980 revealed that two of the three pins in Hathaway's hip had broken. Based on this x-ray, Foote authorized a consultation with Quellman on September 12, 1980. Quellman determined that although the pins had broken, the condition of the hip and the arthritis had not changed otherwise.

Neither Foote nor Quellman informed Hathaway of the broken pins or discussed the option of surgery with him. Hathaway's pain persisted; he complained about his hip pain on ten occasions in 1980 and on twenty-three occasions in 1981, and once was kept for two nights in the prison infirmary because of hip pain. Foote, who saw Hathaway on most of these occasions, typically gave him pain killers.

Hathaway ultimately learned of the broken pins in his hip in July 1981 from a nurse at Great Meadow, one year after Foote and Quellman initially discovered the broken pins. Hathaway testified at trial that within one to two weeks after learning of his condition, he told Foote that he would consent to surgery. Foote referred him to Quellman and did not discuss the option of surgery with him at that time or subsequently. Hathaway claimed that he did not previously request surgery because he was not aware of his condition.

Hathaway's hip pain persisted and he continued to complain to Foote and others. In fact, on January 21, 1982, a Prisoners' Legal Services student attorney wrote to Everett Jones ("Jones"), the superintendent of Great Meadow, on behalf of Hathaway. The letter stated that two independent physicians determined that the treatment Hathaway was receiving—anti-inflammatory medicine and orthopedic shoes—was inadequate given his frequent complaints of pain. The student attorney requested that Hathaway be evaluated and given more extensive treatment. A second student attorney wrote on Hathaway's behalf on October 12, 1982, informing Jones that Hathaway would consent to hip surgery and requesting a new evaluation and treatment plan. Foote responded to Jones by memorandum with respect to both letters. By this time, Hathaway had complained about his pain sixteen times in 1982.

Two weeks later, Hathaway filed an action *pro se* pursuant to 42 U.S.C. § 1983 against several defendants, including Jones and Foote, alleging a denial of medical care. Shortly thereafter, Foote informed Jones that although Hathaway had declined a previous offer of surgery, Foote would refer Hathaway to Quellman for a re-evaluation for surgery. Hathaway met with Quellman on February 4, 1983, and as a result, more sophisticated tests were performed. Quellman testified at trial that as a result of these tests, he concluded that surgery to remove the pins was not medically necessary, but that surgery might reduce Hathaway's pain. Hathaway was then given the option of surgery. He received a second opinion from Schlesinger, who advised that surgery would be appropriate to remove the pins and to perform a bone graft to correct certain de-

formities. On October 13, 1983, Quellman performed the surgery, during which he removed the accessible portions of the broken pins and repaired portions of the hip by bone graft.

Initially, the district court granted defendants' motion for summary judgment and dismissed Hathaway's complaint on the grounds that he failed to state a claim of deliberate indifference to his serious medical needs as required by *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). We reversed the district court's grant of summary judgment because Hathaway's allegation of a two-year delay in arranging hip surgery could constitute the required deliberate indifference. *See Hathaway v. Coughlin,* 841 F.2d 48 (2d Cir.1988).

Upon remand, counsel was appointed for Hathaway and the case proceeded to trial. At the close of evidence, the district court dismissed the complaint against the defendants other than Foote pursuant to Fed. R.Civ.P. 50(a) because of their lack of personal involvement in his care and reserved decision with respect to Foote's motion to dismiss. After the jury ultimately deadlocked, the district court declared a mistrial, at which point Foote moved for dismissal under Fed.R.Civ.P. 50(b). The district court denied Foote's motions, stating that it could not "find that the evidence presented at trial was so overwhelming in favor of [Foote] that reasonable and fair-minded individuals could not arrive at a verdict against [him]." Foote now appeals.

### DISCUSSION

■ On appeal, Foote contends that the district court should have granted his motions to dismiss because Hathaway (1) did not introduce sufficient evidence of a departure from accepted medical practices and (2) failed to adduce proof of the requisite mental state of culpability associated with deliberate indifference. In reviewing the denial of Foote's motion to dismiss, we apply the same standard as did the district court. *See Sarus v. Rotundo,* 831 F.2d 397, 400 (2d Cir.1987). A directed verdict is proper only when, viewing the evidence in a light most favorable to the non-moving party and resolving all rea-sonable inferences in that party's favor, "there is such overwhelming evidence to support the moving party's position that fair and reasonable people could not arrive at a verdict against him." *Hendricks v. Coughlin,* 942 F.2d 109, 112 (2d Cir.1991) (citations omitted).

■ The Eighth Amendment prohibits the infliction of "cruel and unusual punishments" on those convicted of crimes, which includes punishments that "involve the unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976) (citations omitted). The Eighth Amendment also applies to prison officials when they provide medical care to inmates. *See Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). To establish an unconstitutional denial of medical care, a prisoner must prove "deliberate indifference to [his] serious medical needs." *Id.* at 104, 97 S.Ct. at 291.

■ The deliberate indifference standard embodies both an objective and a subjective prong. First, the alleged deprivation must be, in objective terms, "sufficiently serious." *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991). *See Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, *J.,* dissenting) (standard contemplates "a condition of urgency, one that may produce death, degeneration, or extreme pain") (citations omitted). Second, the charged official must act with a sufficiently culpable state of mind. *See Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324. Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *See Farmer v. Brennan,* — U.S. —, —, 114 S.Ct. 1970, 1978, 128 L.Ed.2d 811 (1994). More specifically, a prison official does not act in a deliberately indifferent manner unless that official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at —, 114 S.Ct. at 1979.

A prison official, however, may claim qualified immunity from suit in certain circumstances. This affirmative defense shields public officials from liability for their discretionary acts that do "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Even where, as here, a plaintiff's federal rights are well-established, qualified immunity is still available to an official if it was "objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991) (citations omitted).

As a threshold matter, we must consider Hathaway's contention that we lack appellate jurisdiction because of the interlocutory nature of the order denying Foote's motions to dismiss. Although the order is interlocutory, a denial of a claim of qualified immunity is immediately appealable where it turns on an issue of law. *See Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817–18, 86 L.Ed.2d 411 (1985). Where issues of fact remain with respect to the resolution of a qualified immunity claim, however, an order is not a "final decision" subject to immediate review. *See Moffitt v. Town of Brookfield,* 950 F.2d 880, 884 (2d Cir.1991) (citations omitted). Although the parties disagree on the legal significance of the facts adduced at trial, no genuine factual disputes remain that would warrant dismissal for lack of appellate jurisdiction. Therefore, the central issue is whether a reasonable jury could conclude that Foote exhibited deliberate indifference to Hathaway's serious medical needs.

### (a) Serious Medical Needs

The record clearly supports a finding that Hathaway had serious medical needs. His degenerative hip condition required corrective surgery prior to his incarceration. After the initial surgery, Hathaway continued to experience great pain over an extended period of time and had difficulty walking. Between May 1980 and his surgery in October 1983, Hathaway registered complaints of hip pain on almost seventy occasions.

Foote claims that Hathaway failed to contradict Quellman's testimony that the pain was not caused by the broken pins, but rather was caused by movement within the hip. Quellman admitted, however, that the broken pins "might have been part of his pain" and that he was not asserting that "there was no element ... of pain derived from the pins." Moreover, Foote himself testified that part of the reason he requested approval for surgery was to remove the pins because "some orthopedic people feel that if you get the hardware out, [the hip] will heal a little better." Based on this testimony and the fact that shortly before the broken pins were discovered, Hathaway began to complain with great frequency about pain, even though he had not previously complained for over a year and a half when the pins were presumably intact, a rational jury could find that the broken pins contributed to Hathaway's pain. Because we find that Hathaway had serious medical needs, we next consider whether Foote was deliberately indifferent to those needs.

### (b) Deliberate Indifference

We believe that a rational jury could find that Foote was deliberately indifferent to Hathaway's serious medical needs in that he knew of and disregarded an excessive risk to Hathaway's health. *See Farmer,* —— U.S. at ——, 114 S.Ct. at 1979. Most telling is the fact that Foote never informed Hathaway that he had two broken pins in his hip. Hathaway did not learn of his condition for one year after the July 1980 x-ray. The presence of broken pins in a hip is information that would give most people pause to consider surgery. Nonetheless, Foote never shared this information with Hathaway or raised the possibility of surgery with him following the discovery of the broken pins.

A jury could also infer deliberate indifference from the delay of over two years between the discovery of the broken pins and the time Foote asked that Hathaway be re-evaluated for surgery in November 1982. Hathaway testified that shortly after learning of the broken pins, he told Foote that he would consent to hip surgery. Moreover,

two student attorneys wrote on behalf of Hathaway requesting further evaluation and additional treatment. A jury could conclude that despite these requests and Hathaway's constant complaints, Foote did not take Hathaway's condition seriously because he did not refer Hathaway to Quellman for a re-evaluation until after Hathaway filed his lawsuit on October 25, 1982.

Foote claims that his conduct could not amount to deliberate indifference because he, a general practitioner, merely referred Hathaway to a specialist. Foote cites New York malpractice law, which holds a general practitioner to a more deferential standard when he has referred a patient to a competent specialist. *See Markley v. Albany Medical Center Hospital,* 163 A.D.2d 639, 558 N.Y.S.2d 688, 689–90 (1990). Foote claims that he reasonably relied on Quellman and Schlesinger to render any necessary care to Hathaway.

We disagree. This is not a case where a general practitioner merely referred a patient to a specialist and had limited subsequent contact with that patient. To the contrary, Foote personally saw and treated Hathaway on the majority of the numerous occasions on which Hathaway complained about pain. As such, Foote was the official most familiar with Hathaway's condition, even as a general practitioner. We decline to adopt a rule that in effect would exempt general practitioners from being found deliberately indifferent to a patient's serious medical needs as long as that general practitioner at some point refers the patient to a specialist, regardless of the extent of contact that general practitioner has with the patient.

Foote also makes much of the fact that Hathaway declined an offer of surgery in 1978 and did not request surgery for some time after that. Hathaway declined this surgery, however, more than two years before the broken pins were discovered in his hip and more than three years before he was informed of his condition. The fact that he did not request surgery is thus understandable given that crucial information bearing on his condition was never disclosed to him.

Nor does the fact that Foote frequently examined Hathaway necessarily vindicate Foote. The course of treatment Hathaway received clearly did not alleviate his suffering—between May 1980 and October 25, 1982, he complained of hip pain on nearly fifty occasions. Twenty of these complaints were made in the period after the broken pins were discovered but before Hathaway was so informed. A jury could infer deliberate indifference from the fact that Foote knew the extent of Hathaway's pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve Hathaway's situation.

Foote also contends that the action should have been dismissed because Hathaway did not adduce any expert evidence as to whether Foote's conduct fell below professional norms. Foote argues that by failing to introduce such expert evidence, Hathaway has failed to state a *prima facie* case of medical malpractice. *See Ferretti v. Town of Greenburgh,* 191 A.D.2d 608, 595 N.Y.S.2d 494, 497–98 (2d Dept.1993). Because mere medical malpractice does not constitute an Eighth Amendment violation, *see Estelle,* 429 U.S. at 107, 97 S.Ct. at 292–93, Foote claims that Hathaway's failure to establish at least medical malpractice by means of expert proof mandates dismissal of the instant action.

Foote's argument is unpersuasive. We have never required plaintiffs alleging a denial of adequate medical care in a Section 1983 action to produce expert medical testimony. The inquiry remains whether the treating physician or other prison official was deliberately indifferent to a prisoner's serious medical needs, not whether the doctor's conduct is actionable under state malpractice law. Expert testimony certainly could have bolstered Hathaway's case at trial, but the absence of such expert proof does not mandate dismissal of his action where the facts support a finding of deliberate indifference.

In summary, we do not believe that the evidence produced at the first trial was so overwhelming in favor of Foote that a rational jury could not conclude that he was deliberately indifferent to Hathaway's serious medical needs. A jury could infer deliberate indifference to Hathaway's serious medical needs from Foote's failure (1) to disclose the

broken pins and to discuss the option of surgery with Hathaway despite his sudden resurgence of hip pain and (2) to refer Hathaway for re-evaluation for surgery until late 1982 despite requests for further treatment from Hathaway and student attorneys acting on his behalf. Assuming that Foote was deliberately indifferent to Hathaway's serious medical needs, he is not entitled to qualified immunity because it would not be objectively reasonable for him to believe his conduct did not violate Hathaway's rights. Foote's arguments regarding his status as a general practitioner, the cause of Hathaway's pain, and the absence of expert proof may in fact persuade a second jury that he did not violate Hathaway's Eighth Amendment rights. We believe, however, that this is properly a case for a jury to resolve. Accordingly, the district court correctly denied Foote's motions to dismiss.

## CONCLUSION

Based on the foregoing, we affirm the order of the district court.

JACOBS, Circuit Judge, dissenting:

I respectfully dissent, because in my view Dr. Foote's qualified immunity is amply shown on the fullest possible record—the transcript of a full trial on the merits.

## I

In evaluating Dr. Foote's claim of qualified immunity, the majority frames the critical question as "whether a reasonable jury could conclude that [Dr.] Foote exhibited deliberate indifference to Hathaway's serious medical needs." That is not the standard for considering qualified immunity. The applicable standard is the one announced in the last paragraph of the majority opinion: whether it was objectively reasonable for Dr. Foote to believe that his conduct satisfied the constitutional standards of *Estelle v. Gamble. See Al–Jundi v. Mancusi,* 926 F.2d 235, 239 (2d Cir.1991).

Under *Estelle* (and its progeny), Hathaway must show that Dr. Foote's conduct amounted to "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.* at 106, 97 S.Ct. at 292.

Hathaway has offered no evidence whatever that Dr. Foote was deliberately indifferent to Hathaway's medical needs. Deliberate indifference is not an inadvertent failure to provide adequate medical care. *Rogers v. Evans,* 792 F.2d 1052, 1058 (11th Cir.1986). Hathaway must demonstrate that Dr. Foote "actually wish[ed] him harm, or, at least, [was] totally unconcerned with his welfare." *Duane v. Lane,* 959 F.2d 673, 677 (7th Cir. 1992). Absent a showing of the "unnecessary and wanton infliction of pain," *Estelle,* 429 U.S. at 103, 97 S.Ct. at 290 (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)), the "proper forum" for a prisoner's medical grievance is a state court action for medical malpractice. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293.

It is undisputed that Hathaway's hip refusion surgery was elective, and that the need for the operation was a function of the pain that Hathaway was experiencing. It is also undisputed that the surgery was offered on December 2, 1977. Hathaway, who best knew the level of his discomfort and his ability to contend with it, declined that option on February 3, 1978. When he asked Dr. Foote for surgery in 1981, Dr. Foote promptly referred Hathaway to a specialist. Hathaway asked for hip surgery again on August 5, 1983, but he recanted a few hours later and demanded a second opinion. These events refute altogether the idea that Hathaway was begging an indifferent and calloused doctor for a surgical procedure required to alleviate his agony. Pain is subjective. Given the level of pain that the patient is suffering, the patient's own pain threshold, the risks and possible benefits of an operation, and the pain of surgery, there is nothing odd about someone waiting years before undergoing elective orthopedic surgery.

## II

The majority faults Dr. Foote in a number of respects, none of which remotely evinces deliberate indifference. According to the majority, the most telling circumstance is the one year delay between the time that Dr. Foote learned of the broken pins and the time Hathaway learned of them. This delay, however, is meaningless absent a showing that it was the product of deliberate indifference. *See Wilson v. Seiter*, 501 U.S. 294, 298–99, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (prison official must possess sufficiently culpable state of mind); *Duane*, 959 F.2d at 677 (no cognizable Eighth Amendment claim where prisoner "makes no allegations whatsoever that speak to the [prison officials'] mental states with regard to his medical care"). Hathaway himself admits that Dr. Foote treated him "for his hip pain almost 20 times" during this one year span. *See Jackson v. Cain*, 864 F.2d 1235, 1244 (5th Cir.1989) (prison doctor granted summary judgment where "[t]here [was] no evidence that [prisoner] was denied medication or access to medical attention").

A finding of deliberate indifference is absolutely precluded here, because Hathaway always knew all there was to know about his own pain, and *always* had the option to undergo surgery to alleviate it. The one-year failure to tell Hathaway about the broken pins at most deprived Hathaway of a fact that might have had bearing on his decision to have elective surgery during that year. On that subject, Dr. Quellman testified that the breaking of the pins was a marginal consideration, while Hathaway testified that the state of the pins was critical to his election of surgery. In any event, such a controversy is not properly or sensibly presented under the Eighth Amendment. "We do not sit as a medical board of review. Where the dispute concerns not the absence of help, but the choice of a certain course of treatment, or evidences mere disagreement with considered medical judgment, we will not second guess the doctors." *Sires v. Berman*, 834 F.2d 9, 13 (1st Cir.1987).

At trial, the undisputed medical testimony was that Hathaway's pain—not the presence of the broken pins—was the medical indication justifying surgery. This cannot be disputed because in fact the pins were never removed. Hathaway testified:

Q: Now the exhibit shows an X-ray of your hip and it shows these pins?

A: Yes.

Q: Are any parts of these still in your body?

A: Yes, they're still there.

Given this admission, the uncontradicted medical testimony at trial, and the fact that Hathaway has not attacked the adequacy of the surgical procedure that left the pins largely intact, Hathaway cannot withstand a dismissal on the ground of qualified immunity by the resolve expressed by his counsel at oral argument to supplement the plaintiff's case with medical testimony at a future second trial.

The majority also finds evidence of Dr. Foote's deliberate indifference in the fact that "Hathaway testified that shortly after learning of the broken pins, he told Foote that he would consent to hip surgery." Hathaway's testimony about that July, 1981 consultation also establishes that, as soon as Hathaway mentioned surgery to Dr. Foote, the general practitioner referred Hathaway to Dr. Quellman, an orthopedic specialist. I agree with the majority that we need not adopt a rule exempting "general practitioners from being found deliberately indifferent to a patient's serious medical needs as long as that general practitioner *at some point* refers the patient to a specialist, regardless of the extent of contact that general practitioner has with the patient." (Emphasis added.) Surely it matters, however, in an examination of Dr. Foote's mental state, that he referred Hathaway to a specialist *promptly*, and took steps within his own medical expertise to alleviate Hathaway's pain.

Finally, the majority grounds its finding of deliberate indifference in Dr. Foote's failure to act on two letters written by "student attorneys" requesting further evaluation and informing the prison superintendent that Hathaway would consent to surgery. Foote, however, could not properly act on a consent to surgery given by someone other than his patient. Moreover, I do not see how see how

a general practice physician can be found to have acted with deliberate indifference in promptly referring a patient to a specialist rather than unilaterally ordering surgery. Dr. Foote, being neither an orthopedist nor a law student, acknowledged his limited expertise in the treatment of this patient.

### III

The facts in *Estelle* furnish a template for evaluating medical malfeasance claims under the Eighth Amendment and the invocation of qualified immunity for such claims. The examples of deliberate indifference cited in *Estelle* furnish no analog to Dr. Foote's professional conduct. In *Williams v. Vincent,* 508 F.2d 541 (2d Cir.1974), the prison surgeon discarded the prisoner's ear and stitched the stump, explaining to the prisoner that he "did not need his ear" and throwing "the severed portion away in front of him." 508 F.2d at 544. In *Thomas v. Pate,* 493 F.2d 151, 158 (7th Cir.1974), the prison doctor injected the prisoner with penicillin, knowing that the prisoner was allergic, and then refused to treat the allergic reaction. In *Martinez v. Mancusi,* 443 F.2d 921 (2d Cir.1970), the prison doctor refused to administer the prescribed pain killer and frustrated the prisoner's leg surgery by requiring the prisoner to stand despite contrary instructions of the surgeon.

What did Dr. Foote do? He arranged consultations with a medical specialist who offered surgery to correct the condition; when the patient declined surgery, Dr. Foote issued pain-killers, prescribed and arranged the replacement of corrective footwear, arranged housing on the first floor of the prison to reduce stair-climbing, and excused the prisoner from work detail. Altogether, Dr. Foote saw his patient dozens of times. These facts most closely resemble the facts in the *Estelle* opinion, which of course rejected the claim of deliberate indifference. In *Estelle,* the inmate contended "that more should have been done by way of diagnosis and treatment, and suggest[ed] a number of options that were not pursued." 429 U.S. at 107, 97 S.Ct. at 292–93. Nevertheless, because the prisoner was "seen by medical personnel on 17 occasions spanning a 3–

month period," *id.,* the Supreme Court found that the prisoner did not make out a cognizable Eighth Amendment claim. And that case involved the dismissal of a *pro se* complaint for failure to state a claim under a standard far more liberal than the one a counseled plaintiff must satisfy to overcome a defense of qualified immunity. The record of Dr. Foote's services to Hathaway reflects far greater solicitude, attention and care.

The cases following *Estelle* reinforce the view that Dr. Foote's care of his patient implicates no Eighth Amendment concern. *See, e.g., Jones v. Smith,* 784 F.2d 149 (2d Cir.1986) (no violation where prisoner, who had refused treatment before being moved to special housing unit, was denied prescribed therapy for a back injury after the move); *Sosebee v. Murphy,* 797 F.2d 179 (4th Cir. 1986) (no violation where doctor prescribed stomach nostrums to an inmate who, having swallowed a steak bone, later died of a punctured esophagus); *Lynsky v. City of Boston,* 761 F.Supp. 858 (D.Mass.1990) (no violation where doctor failed to order diagnostic tests for obese inmate with a heart condition who died soon after of a heart attack).

I cannot agree that Dr. Foote's treatment of his patient was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Estelle,* 429 U.S. at 105, 97 S.Ct. at 291–92. The record below—undisputed after trial—does more than redeem Dr. Foote from the taint of depravity or sadism that a viable Eighth Amendment claim entails. This record in my view indicates that Dr. Foote and the people of the State of New York can take pride in the solicitous and humane care that Dr. Foote afforded his incarcerated patient.