**Jimmie LLOYD, Plaintiff,**

v.

**Dr. Joshua LEE, Dr. Eugene Mateo, Dr. Lester Lieberman, Dr. Marshall Tse, Dr. Jane SanJose, Dr. Yundo Park, Franklin Edwards, Site Medical Director, and Mayor Michael Bloomberg, Defendants.**

**No. 07 Civ. 2466 (DC).**

United States District Court, S.D. New York.

Aug. 14, 2008.

---

Jimmie Lloyd, Ogdensburg, NY, Plaintiff Pro Se.

Gillian C. Thomas, Esq., Heidell, Pittoni, Murphy & Bach LLP, Trial Attorneys for Corporation Counsel of the City of New York, New York, NY, for Defendants.

### OPINION

CHIN, District Judge.

*Pro se* plaintiff Jimmie Lloyd brings this prisoner civil rights action pursuant to 42 U.S.C. § 1983, alleging that officials of Prison Health Services denied him adequate medical care while he was incarcerated at the Manhattan House of Detention and Riker's Island Corrections Building, in

violation of his constitutional rights. The defendants, Dr. Joshua Lee, Dr. Eugene Mateo, Dr. Lester Lieberman, Dr. Marshall Tse, Dr. Jane SanJose, Dr. Yundo Park, Franklin Edwards,[1] Site Medical Director, and Mayor Michael Bloomberg move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. Alternatively, defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56.

For the reasons that follow, defendants' motion to dismiss is granted in part and denied in part.[2] Lloyd's principal claim—that his civil rights were violated because he did not receive proper medical treatment—survives, for the amended complaint asserts a plausible claim of deliberate indifference. As an MRI eventually revealed, Lloyd suffered a torn rotator cuff and a ripped tendon in his left shoulder. Yet, Lloyd was not given an MRI until almost a year after he was injured. The doctors did request an MRI, but they permitted nine months to go by before the MRI was actually taken. Given the seriousness of Lloyd's injuries and his repeated complaints of severe pain, a reasonable jury could infer that the doctors acted with deliberate indifference by failing to take steps to ensure that Lloyd was given an MRI and other medical care in a more timely manner.

1. It is not clear whether Franklin Edwards has been properly served with the summons and complaint. He is not a party to the current motion, as he has not consented to representation by defense counsel.

2. Defendants' motion for summary judgment is not being considered at this early stage in the litigation, when the *pro se* plaintiff has not had an opportunity to conduct discovery. *See Sereika v. Patel,* 411 F.Supp.2d 397, 405

## BACKGROUND

### A. *Facts*

The facts alleged in the amended complaint are assumed to be true for purposes of this motion.

Lloyd is currently an inmate at the Ogdensburg Correctional Facility. He was arrested on May 18, 2005 in Manhattan. (Am. Compl. ¶ 10). Upon his arrest, Lloyd was beaten by arresting officers and suffered injuries to his left shoulder. (*Id.* ¶ 11). On May 21, 2005, Lloyd was processed at the Manhattan House of Detention. (*Id.* ¶ 14). The following day Lloyd signed up for sick call and was examined by Dr. Lee. (*Id.* ¶ 15). Dr. Lee submitted an X-ray request and gave Lloyd Motrin for his pain. (*Id.*).

On June 1, 2005, Lloyd returned to sick call and was seen by Dr. Mateo. (*Id.* ¶ 16). Lloyd complained that he was suffering from pain in his left shoulder and asked Dr. Mateo about the status of his X-ray request. (*Id.*). Dr. Mateo responded that the request for the X-ray was submitted and that the procedure should take place "any day now." (*Id.*).

Two weeks later, Lloyd returned to sick call and was seen by Dr. Mateo. (*Id.* ¶ 17). Lloyd inquired about the status of the X-ray request, which was submitted on May 21, 2005. (*Id.*). Dr. Mateo called the facility where X-rays are performed and was told that the request was submitted on June 10, 2008 and that the X-ray was not yet scheduled. (*Id.*).

(S.D.N.Y.2006). The Court notes that defendants have submitted evidence relating to plaintiff's medical history. (Defs.' Notice of Mot. Exs. C–D). The Court is not permitted to consider such evidence on a motion to dismiss under Rule 12(b)(6). *See Harris v. Westchester County Dep't of Corrections,* No. 06 Civ.2011(RJS), 2008 WL 953616, at *25 n. 8 (S.D.N.Y. Apr. 3, 2008).

On July 2, 2005, Lloyd was transferred from the Manhattan House of Detention to Riker's Island Corrections Building. (*Id.*). On July 3, 2005, Lloyd signed up for sick call and was seen by Dr. Tse. (*Id.* ¶ 19). Lloyd informed Dr. Tse that he never received an X-ray and that he was still experiencing extreme pain as a result of the injuries he sustained on the day of his arrest. (*Id.*). Dr. Tse gave Lloyd Motrin for his pain and submitted a request for an X-ray. (*Id.*).

Finally, on July 17, 2005, the shoulder X-ray was performed. (*Id.*). The results did not reveal any abnormalities. (*Id.*). On July 23, 2005, Lloyd returned to sick call and was seen by Dr. Park. (*Id.* ¶ 20). Because Lloyd was still experiencing pain and the X-ray study was negative, Dr. Park submitted a request for an orthopedist consult and gave Lloyd "Naprosyn" to help relieve his pain. (*Id.*).

On August 4, 2005, Lloyd was examined by Dr. Lieberman, an "orthopedic doctor." (*Id.* ¶ 21). Lloyd was unable to lift his arm above his head and was also unable to hold his arm out in front of himself at a ninety degree angle. (*Id.*). Dr. Lieberman diagnosed the condition as "rotator cuff syndrome" and submitted a request for both another X-ray and an MRI. (*Id.*). The results of the second X-ray were also negative. (*Id.* ¶ 22).

On August 14, 2005, Lloyd went to physical therapy; however, he was unable to stand treatment due to extreme pain. (*Id.*). Lloyd returned to sick call following his August 16, 2005 physical therapy session. (*Id.* ¶ 23). He saw Dr. SanJose and asked for pain killers to alleviate his pain and discomfort. (*Id.*). During this visit, Lloyd approached Edwards, the Site Medical Director, explained his medical situation, and inquired about the status of the MRI request. (*Id.*). Edwards told Lloyd that scheduling could be delayed because it was done by the designated hospitals and the clinic had to wait for the hospitals to respond to requests. (*Id.*). Lloyd then asked whether physicians were required to follow up to ensure that MRIs are scheduled. (*Id.*). Edwards responded that it was "protocol" for physicians to follow up on pending procedures. (*Id.*).

On August 30, 2005, Lloyd signed up for sick call again and saw Dr. Tse. (*Id.* ¶ 24). Lloyd told Dr. Tse that he was frustrated with his medical treatment. (*Id.*). Dr. Tse "submitted another request to see Dr. Lieberman." (*Id.*).

On September 3, 2005, Lloyd visited the sick call clinic to try to determine why his MRI was delayed. (*Id.* ¶ 25). He spoke with Dr. SanJose, who submitted another request for an MRI at Queens Hospital. (*Id.*).

On September 10, 2005, Lloyd was seen by Dr. Lieberman for another consultation. (*Id.* ¶ 26). Dr. Lieberman noted that Lloyd's condition had not changed and submitted requests for a C–Spine X-ray and for appointments with two orthopedic specialists at Bellevue Hospital. (*Id.*). On September 21, 2005, Lloyd went to Bellevue Hospital for an appointment with the orthopedist specialists. (*Id.* ¶ 27). The specialists also diagnosed Lloyd's injury as a rotator cuff syndrome and recommended that he have an MRI. (*Id.*).

On October 3, 2005, Lloyd was called to the clinic for an X-ray. (*Id.* ¶ 28). When he arrived he refused the X-ray, thinking that this was the same type of X-ray that he had already had twice before. (*Id.*). Lloyd later learned that the October 3, 2005 appointment was for a C–Spine X-ray, which was different from the previous X-rays and was ordered to provide an improved graphical reading of Lloyd's injury. (*Id.* ¶ 29). On November 15, 2005, Lloyd returned to the clinic to have the C–

Spine X-ray. (*Id.* ¶ 30). A week later, Lloyd saw Dr. Lieberman, who reported that the C–Spine X-ray showed an "old, healed fracture on the lateral end of the clavicle." (*Id.* ¶ 31). Lloyd asked Dr. Lieberman about his options, since he had lost almost all mobility in his arm and was frustrated by the fact that the C–Spine X-ray results were not helpful in remedying the underlying medical problem. (*Id.*). Dr. Lieberman suggested that he return to physical therapy. (*Id.*). Lloyd questioned Dr. Lieberman about the delay in receiving an MRI. Dr. Lieberman responded that Queens Hospital never called to schedule the MRI and that he submitted another MRI request to Bellevue Hospital. (*Id.* ¶ 32). Lloyd then asked why he did not have an MRI while he was at Bellevue Hospital on two prior occasions. (*Id.* ¶ 33). Dr. Lieberman responded that the last MRI request was submitted after Lloyd's trips to Bellevue Hospital. (*Id.*). Dr. Lieberman then became upset by Lloyd's questioning and asked him to leave his office. (*Id.*).

On November 20, 2005, Lloyd returned to sick call and saw Dr. Park. (*Id.* ¶ 34). He asked Dr. Park if he could meet with Mr. Edwards. (*Id.*). Lloyd told Mr. Edwards that he believed his right to adequate medical care was being neglected because the physicians did not follow up on the MRI requests. (*Id.*). Mr. Edwards told Lloyd that once an MRI request is submitted "there is very little they can do." (*Id.*).

On December 1, 2005, Lloyd signed up for sick call again and was seen by Dr. Park. (*Id.* ¶ 35). He explained that he had been injured six months earlier and that he was waiting for an MRI to be scheduled for four months and that the condition of his arm had not improved. (*Id.*). Dr. Park told Lloyd that he would submit another MRI request and that he simply had

to wait until the hospital scheduled the procedure. (*Id.*). Lloyd continued to sign up for sick call throughout the month of December in hopes of getting an MRI. (*Id.* ¶ 36).

On January 9, 2006, Lloyd pled guilty to the crime for which he was charged. (*Id.* ¶ 37). Three weeks later he was transferred to C–74(GMVC), where he stayed for two weeks until he was transferred to Ulster Correctional Facility. (*Id.*). Dr. Lieberman did not place Lloyd under a medical hold. (*Id.* ¶ 38). Instead, he indicated to the Department of Corrections that Lloyd no longer suffered from any injuries and could be transferred to another facility. (*Id.*).

Lloyd arrived at Ulster Correctional Facility and signed up for sick call. (*Id.* ¶ 39). He was not treated, however, because the facility did not have a copy of his medical records. (*Id.*). On March 2, 2006, Lloyd arrived at Mohawk Correctional Facility. (*Id.* ¶ 40). He immediately signed up for sick call and explained his situation to the facility's physician, Dr. Grabo, who submitted a request for an MRI. (*Id.*). On April 24, 2006, Lloyd was called to the clinic to have an MRI. (*Id.* ¶ 41). When the results came back, Dr. Grabo explained that Lloyd had a "torn rotator cuff and a ripped supraspinatus tendon on the left shoulder, that needed to be repaired." (*Id.*). He then submitted a request for Lloyd to be seen by the clinic's orthopedic specialist. (*Id.*).

On May 17, 2006, Lloyd saw the specialist, who concluded that Lloyd needed surgery. (*Id.* ¶ 42). Albany approved the surgery on July 1, 2006. (*Id.* ¶ 44). The surgery took place in Rome Memorial Hospital on September 28, 2006, and recovery was expected to take at least one year. (*Id.*).

## B. *Procedural History*

Plaintiff filed this *pro se* action on February 13, 2007. Chief Judge Wood granted plaintiff leave to amend his complaint to name the individuals personally involved in the alleged violation of his right to medical care. The amended complaint was filed on May 15, 2007. Pursuant to 42 U.S.C. § 1983, Lloyd alleges violations of his rights under the Eighth, Fourteenth, and Ninth Amendments. Specifically, he claims that Lee, Mateo, Lieberman, Tse, SanJose, Park, and Edwards violated his civil rights by depriving him of an MRI and failing to resolve his medical issues. Additionally, Lloyd claims that Mayor Bloomberg violated his rights by allowing Prison Health Services to provide inadequate medical services. Lloyd seeks money damages and the prosecution of defendants.

On May 30, 2007, the matter was reassigned to me. On January 11, 2008, defendants moved to dismiss the amended complaint, or, in the alternative, for summary judgment. After a number of extensions were granted, the Court received plaintiff's opposition papers on June 3, 2008.

## DISCUSSION

Defendants argue that the amended complaint fails to state a claim upon which relief can be granted, with respect to the Eighth, Ninth, and Fourteenth Amendments. Defendants also argue that they are entitled to qualified immunity. Finally, defendants contend that Mayor Bloomberg was not personally involved in the alleged violation and thus is not liable as a matter of law.

I discuss first the standards applicable to motions to dismiss pursuant to Rule 12(b)(6). I then discuss the claims against Mayor Bloomberg, the alleged Ninth Amendment violations, the claims under the Eighth and Fourteenth Amendments, and the qualified immunity defense.

## A. *Motion to Dismiss Standard*

On a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted, the court must accept the factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir. 1996).

The *Conley v. Gibson* standard, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), which provided that dismissal was inappropriate "unless it appears beyond a doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief," was recently abrogated by the Supreme Court in *Bell Atlantic v. Twombly*, —— U.S. ——, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007). In *Twombly*, the Court held that,

> [w]hile a Complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

*Twombly*, 127 S.Ct. at 1964–65. The Court also held that, "[o]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 1969.

The Second Circuit has interpreted the *Twombly* decision as " 'not requiring a universal standard of heightened fact pleading, but instead, [as] requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegation in those contexts where such amplification is needed to render a claim plausible.' " *Jones v. Westchester County*

*Dep't of Corrections Med. Dep't*, 557 F.Supp.2d 408, 412 (S.D.N.Y.2008) (quoting *Iqbal v. Hasty*, 490 F.3d 143, 157–58 (2d Cir.2007)). The question is whether the pleading alleges " 'enough facts to state a claim for relief that is plausible on its face.' " *Patane v. Clark*, 508 F.3d 106, 111–12 (2d Cir.2007) (quoting *Twombly*, 127 S.Ct. at 1974).

**B. The Claims against Mayor Bloomberg**

■ To state a claim under 42 U.S.C. § 1983, a plaintiff must allege a violation of his constitutional or statutory rights by a person acting under color of state law. *See* 42 U.S.C. § 1983; *Jones*, 557 F.Supp.2d at 413–14. A defendant is not liable, however, unless he or she is actually involved, for personal involvement is "a prerequisite to an award of damages under § 1983." *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir.1986) (internal quotations and citation omitted); *see also Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."); *Green v. Bauvi*, 46 F.3d 189, 194 (2d Cir.1995). Liability may not be premised on the respondeat superior or vicarious liability doctrines, "[n]or may a defendant be held liable merely by his connection to the events through links in the chain of command." *Reynolds v. Goord*, No. 98 Civ. 6722(DLC), 2000 WL 235278, at *7 (S.D.N.Y. Mar. 1, 2000).

■ On the other hand, direct participation is not necessary. A supervisory official may be personally liable if she has "actual or constructive notice of unconstitutional practices and demonstrates 'gross negligence' or 'deliberate indifference' by failing to act." *Meriwether v. Coughlin*, 879 F.2d 1037, 1048 (2d Cir.1989). Thus, the personal involvement of a supervisory defendant may be shown by evidence that

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995); *see also Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir.1997) (citing *Williams*, 781 F.2d at 323–24).

■ Here, Lloyd's claims against Mayor Bloomberg must be dismissed, for Lloyd has not alleged that the Mayor was personally involved in any alleged constitutional deprivation. Lloyd alleges that Mayor Bloomberg was involved only to the extent that Prison Health Services is "contracted by Mayor Bloomberg." (Am. Compl. ¶ 27). Even if true, this allegation is insufficient, for Lloyd fails to allege that Mayor Bloomberg (1) actually or directly participated in the constitutional violation, (2) failed to remedy a wrong after being informed through a report, (3) created a policy or custom under which unconstitutional practices occurred, (4) was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. *See Colon*, 58 F.3d at 873. As the amended complaint does not state a plausible claim against Mayor Bloomberg,

the claims against the Mayor are dismissed.

## C. *The Ninth Amendment Claims*

■■■ The Ninth Amendment provides that "[t]he enumeration in the Constitution of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. Const. amend. IX. It is not an independent source of constitutional rights that may be asserted in a civil rights action. *See Diaz v. City of New York,* No. 00 Civ. 2944(JMA), 2006 WL 3833164, at *7 (E.D.N.Y. Dec. 29, 2006). The Ninth Amendment cannot serve as the basis for a § 1983 claim because such a claim must be premised on the violation of a right guaranteed by the U.S. Constitution or federal law. *See Salaman v. DeJesus,* No. 05 Civ. 1608(JBA), 2008 WL 160592, at *3 (D.Conn. Jan. 15, 2008); *In re State Police Litig.,* 888 F.Supp. 1235, 1258 (D.Conn.1995), *appeal dismissed,* 88 F.3d 111 (2d Cir.1996).

Defendants argue that plaintiff fails to state a Ninth Amendment claim. I agree. The Ninth Amendment claim is dismissed.

## D. *The Eighth Amendment Claim*

### 1. *Applicable Law*

■■■ "The Eighth Amendment, which applies to the states under the Due Process Clause of the Fourteenth Amendment, guarantees freedom from cruel and unusual punishment." *Jones,* 557 F.Supp.2d at 413. An inmate may be subjected to cruel and unusual punishment in the medical context when prison officials breach their duty "to ensure that inmates receive adequate medical care." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir. 2006) (citing *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

■■■ To prevail on an Eighth Amendment claim in the medical treatment context, a prisoner plaintiff must prove two elements: (1) a deprivation that is "sufficiently serious," *i.e.,* a deprivation that presents a " 'condition of urgency, one that may produce death, degeneration, or extreme pain,' " *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (quoting *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., *dissenting* )), and (2) reckless indifference, that is, "defendants were aware of plaintiff's serious medical needs and consciously disregarded a substantial risk of serious harm." *Singleton v. Perilli,* No. 03 Civ. 2271(DC), 2004 WL 74238, at *3 (S.D.N.Y. Jan. 16, 2004). I discuss each of the two elements in more detail.

### a. *Objective Element*

■■■ The first element is objective and requires a "sufficiently serious" deprivation. In assessing whether the first element is met, courts usually make two inquiries. First, the court considers whether there was an actual deprivation of adequate medical care. *Salahuddin,* 467 F.3d at 279. Because prison officials have a duty only to provide reasonable care, officials who act reasonably in response to an inmate's medical condition cannot be found liable under the Eighth Amendment. *Id.* If a prison official fails to respond reasonably to an inmate's medical condition, however, liability may arise. *Id.* at 279, 280 (citing *Farmer v. Brennan,* 511 U.S. 825, 847, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

Second, the court considers "whether the inadequacy in medical care is sufficiently serious." *Salahuddin,* 467 F.3d at 280. "This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id.* (citing *Helling v. McKin-*

*ney,* 509 U.S. 25, 32–33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)).

### b. *Subjective Element*

 The second element of an Eighth Amendment claim is subjective: "the charged official must act with a sufficiently culpable state of mind." *Salahuddin,* 467 F.3d at 280 (citing *Wilson v. Seiter,* 501 U.S. 294, 300, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). In other words, a plaintiff must show that the prison official acted with "deliberate indifference" to the inmate's medical condition. *Id.* "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety,'" *Smith,* 316 F.3d 178, 184 (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

 The Eighth Amendment is not violated by mere negligence, medical malpractice, or differences of opinion regarding medical treatment. *Boomer v. Lanigan,* No. 00 Civ. 5540(DLC), 2001 WL 1646725, at *3 (S.D.N.Y. Dec. 17, 2001). On the other hand, a constitutional violation may exist even in the absence of intentional conduct; an Eighth Amendment claim does not require "conduct undertaken for the very purpose of causing harm." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). What is required is deliberate indifference: a state of mind equivalent to the familiar standard of recklessness as used in criminal law. *Smith,* 316 F.3d at 184 (quoting *Phelps v. Kapnolas,* 308 F.3d 180, 186 (2d Cir.2002) (per curiam)). This means that a plaintiff need not plead that the defendant acted purposely or knowingly. A plaintiff must allege, however, that a defendant acted with a mental state more blameworthy than negligence. *Hernandez*

*v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citing *Farmer,* 511 U.S. at 835, 114 S.Ct. 1970).

 In *Smith,* the Second Circuit held that, to demonstrate deliberate indifference, a prisoner had to show more than "an inadvertent failure to provide adequate medical care" by prison officials. *Smith,* 316 F.3d 178, 184 (2d Cir.2003) (citing *Estelle v. Gamble,* 429 U.S. 97, 105–06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). A defendant's actions must amount to an act or failure to act . . . that evinces "a conscious disregard of a substantial risk of serious harm." *Hernandez,* 341 F.3d at 144 (citing *Chance,* 143 F.3d 698, 703 (2d Cir. 1998)) (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)).

### 2. *Application*

Lloyd argues that the delay in receiving an MRI constitutes a violation of his right to adequate medical care. Specifically, he alleges that defendants were "deliberately negligent" in providing adequate medical care by (1) failing to remedy his injuries; (2) failing to follow up on submitted MRI requests; and (3) failing to diagnose his injuries.

Defendants contend that, at best, Lloyd's claims amount to a negligence or medical malpractice claims as he has not sufficiently pled deliberate indifference. Also, defendants argue that the amended complaint fails to support a claim that Lee and Mateo were deliberately indifferent to Lloyd's serious medical needs, because Lee and Mateo only treated Lloyd between May 22, 2005 and June 4, 2005, before an orthopedic consultation was performed or an MRI was contemplated.[3]

---

**3.** The Prison Litigation Reform Act (the "PRLA") requires an inmate to exhaust all administrative remedies before filing suit in federal court. *See* 42 U.S.C. § 1997e(a).

Here, defendants have not alleged that plaintiff failed to exhaust his administrative remedies.

#### a. *Objective Element*

■ The first requirement, the objective prong of the deliberate indifference test, is met because the amended complaint sufficiently pleads an actual deprivation of adequate medical care that was sufficiently serious. Lloyd contends that he was denied an MRI for months and that, as a consequence, his injury was not properly diagnosed and his surgery was unreasonably delayed. Lloyd also alleges that this inadequate medical treatment caused a condition of urgency, degeneration, and extreme pain, and delayed the surgery that was necessary to his recovery.

■ In *Jones v. Westchester County Department of Corrections*, 557 F.Supp.2d at 415, the court held that, on a motion to dismiss, the plaintiff "adequately pleaded" the objective element by alleging that he experienced chronic pain and that the pain "would have been alleviated" if he had been given reasonable care. Here, the amended complaint alleges a sixteen-month delay from the time Lloyd was injured until he finally obtained relief in the form of surgery on his shoulder; during this period he purportedly experienced extreme pain, discomfort, and loss of mobility. The amended complaint plausibly alleges that the delay in receiving the MRI contributed to Lloyd's pain, discomfort, and loss of mobility, delayed his surgery, and increased the time required for his injuries to heal.[4] Therefore, at this motion to dismiss stage, the objective element of the deliberate indifference test is sufficiently alleged.

#### b. *Subjective Element*

Lloyd also satisfies the subjective element of the deliberate indifference test, at least as to many of the defendants. Lloyd contends that doctors did not follow up on their MRI requests, thereby failing to remedy his medical issues. He alleges that almost nine months passed from the time an MRI was requested until he received one. During this time, Lloyd regularly visited sick call and met with the physician defendants to discuss the delay in receiving an MRI and the delay in remedying his medical condition. Although the doctors consistently blamed hospital staff for the delays, Lloyd plausibly alleges that the prison doctors were engaging in a blame shifting process, which resulted in the unreasonable delays. (Am. Compl. ¶ 27). Lloyd also alleges that Dr. Lieberman told the Department of Corrections that he could be transferred to an upstate facility because he had no further injuries. (*Id.* ¶ 38). After Lloyd was transferred, he finally received an MRI, his injuries were discovered, and surgery was performed to correct those injuries.

In *Hathaway v. Coughlin*, the Second Circuit held that a prison doctor could be found to have been deliberately indifferent to a prisoner's serious medical needs "in that he knew of and disregarded an excessive risk to [the prisoner's] health." *Hathaway v. Coughlin*, 37 F.3d 63, 68 (2d Cir. 1994). The *Hathaway* court also held that a "jury could conclude that despite ... request[s] [for further evaluations] and Hathaway's constant complaints" the prison doctor "did not take Hathaway's condition seriously" because he did not refer Hathaway to a specialist until after a lawsuit was filed. *Id.* Additionally, the court noted that the fact that Hathaway was frequently examined by the prison doctor

---

4. Where a *pro se* litigant is involved, the Court has an obligation to "read the pleadings of a *pro se* plaintiff liberally and interpret them 'to raise the strongest arguments they suggest.' "

*McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)).

did not mean that the doctor was free from any § 1983 liability. *Id.* In fact, the court held that "[a] jury could infer deliberate indifference from the fact that [Dr.] Foote knew the extent of Hathaway's pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve Hathaway's situation." *Id.*

In *Stevens v. Goord,* plaintiff claimed that defendants' delay in treating his scoliosis-related respiratory distress and chest pain served as a basis for his Eighth Amendment claim. The court concluded that "judgments that have no sound medical basis, contravene professional norms, and appear designed simply to justify an easier course of treatment (in this case no treatment) may provide a basis of a[n] [Eighth Amendment] claim." *Stevens v. Goord,* 535 F.Supp.2d 373, 388 (S.D.N.Y. 2008). The court also noted that " '[i]n certain instances, a physician may be deliberately indifferent if he or she consciously chooses 'an easier and less efficacious' treatment plan.' " *Id.* (quoting *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998)). The court concluded that the doctor's decision not to pursue a course of treatment, "given the pain and discomfort that plaintiff continued to suffer for approximately eight additional months as a result, [went] beyond mere negligence and serve[d] as an additional basis for plaintiff's constitutional claim." *Id.* at 389.

██ Here, the amended complaint plausibly alleges that doctors knew that Lloyd was experiencing extreme pain and loss of mobility, knew that the course of treatment they prescribed was ineffective, and declined to do anything to attempt to improve Lloyd's situation besides re-submitting MRI request forms. A reasonable jury could infer deliberate indifference from the failure of the doctors to take further steps to see that Lloyd was given

an MRI. The argument that the doctors here did not take Lloyd's condition seriously is plausible, given the length of the delays. Nine months went by after the MRI was first requested before the MRI was actually taken. Once the MRI was taken, it showed that Lloyd suffered a "torn rotator cuff and a ripped supraspinatus tendon on the left shoulder, that needed to be repaired." (Am. Compl. ¶ 41). Had the doctors followed up on the numerous requests for an MRI, the injury would have been discovered earlier, and some of the serious pain and discomfort that Lloyd experienced for more than a year could have been averted. *See Harris v. Westchester County Dep't of Corrections,* 2008 WL 953616, at *23 (despite plaintiff's sparse allegations as to defendant's conduct, at the 12(b)(6) stage plaintiff sufficiently alleged facts supporting a plausible claim that defendant was deliberately indifferent to plaintiff's medical needs). Therefore, accepting Lloyd's allegation as true and drawing all reasonable inferences in his favor, Lloyd has plausibly alleged that defendants were deliberately indifferent to his serious medical needs.

██ The amended complaint fails, however, as to Drs. Lee and Mateo, for they are alleged to have been involved only in the first few weeks after Lloyd's arrest and injury. Dr. Lee is alleged to have seen Lloyd only once, on May 22, 2005, just a few days after his injury. Dr. Lee requested an X-ray. He is not alleged to have had any further involvement with Lloyd at all. Dr. Mateo is alleged to have seen Lloyd only twice, on June 1, 2005 and approximately two weeks later. At that early stage, they cannot be charged with deliberate indifference for failing to follow-up on the request for an MRI, for that request was not made until weeks later, on August 4, 2005. The claim of deliberate indifference is not plausible as to Drs. Lee

and Mateo, given their limited roles early in Lloyd's treatment. Hence, the claims against Drs. Lee and Mateo are dismissed.

### E. *Fourteenth Amendment Claim*

 Pretrial detainees are protected by the Due Process Clause of the Fourteenth Amendment rather than by the Eighth Amendment's prohibition on cruel and unusual punishment, which applies only to convicted prisoners. *See, e.g., Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996); *Vallen v. Carrol,* No. 02 Civ. 5666(PKC), 2005 WL 2296620, at *8 (S.D.N.Y. Sept. 20, 2005). Because "an unconvicted detainee's rights are at least as great as those of a convicted prisoner," *Weyant,* 101 F.3d at 856, courts apply the same "deliberate indifference" test developed under the Eighth Amendment to Fourteenth Amendment claims. *See Heisler v. Kralik,* 981 F.Supp. 830, 835 n. 1, 836 (S.D.N.Y.1997).

 Defendants argue that Lloyd fails to state a Fourteenth Amendment claim. Because the Due Process Clause of the Fourteenth Amendment protects pre-trial detainees, Lloyd brings a viable Fourteenth Amendment claim to the extent that he alleges that he was deprived medical care during the period prior to his guilty plea. Because the same "deliberate indifference" test is applied under both the Eighth and the Fourteenth Amendment, and because Lloyd alleges the same negligent deprivation by the doctors who treated him before his plea, his Fourteenth Amendment claim survives as well, except as to Drs. Lee and Mateo.

### F. *Qualified Immunity*

 "The doctrine of qualified immunity shields government employees acting in their official capacity from suits for damages under 42 U.S.C. § 1983, unless their conduct violated clearly established rights of which an objectively reasonable official would have known." *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 568–69 (2d Cir.1996); *see also Hathaway v. Coughlin,* 37 F.3d 63, 67 (2d Cir.1994) ("[Q]ualified immunity ... shields public officials from liability for their discretionary acts that do not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (internal quotations omitted)). Even when a plaintiff's federal rights are well-defined, a defendant may successfully claim qualified immunity "if it was objectively reasonable for the public official to believe that his acts" were lawful. *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991).

 Defendants argue that they are entitled to qualified immunity because no reasonable jury could conclude that it was objectively unreasonable for them to believe that they were acting in a fashion that did not clearly violate an established federally protected right. On a motion to dismiss, a qualified immunity defense will prevail "if the complaint fails to allege the violation of a clearly established constitutional right." *Williams v. Fisher,* No. 02 Civ. 4558(LMM), 2003 WL 22170610, at *11 (S.D.N.Y. Sept. 18, 2003). Here, Lloyd has plausibly alleged a violation of a clearly established constitutional right. *See id.* As discussed above, Lloyd plausibly alleges that defendants (except Mayor Bloomberg and Drs. Lee and Mateo) acted with deliberate indifference to his serious medical needs in violation of his Eighth Amendment rights. If Lloyd indeed is able to prove that defendants acted with deliberate indifference, qualified immunity will not shield defendants from liability. *See id.*

### CONCLUSION

For the reasons set forth above, defendants' motion to dismiss is granted in part

and denied in part. All claims against defendant Mayor Bloomberg and Drs. Lee and Mateo are dismissed, and the Ninth Amendment claim is dismissed as to all defendants.

SO ORDERED.